Joseph James **BLAKE**,
Petitioner-Appellee,

v.

Ralph **KEMP**, Warden, Georgia Diagnostic Center, Respondent-Appellant.

No. 81–7417.

United States Court of Appeals,
Eleventh Circuit.

March 29, 1985.

Rehearing and Rehearing En Banc
Denied May 13, 1985.

---

Susan V. Boleyn, Asst. Atty. Gen., Atlanta, Ga., for respondent-appellant.

Joe Nursey, Andrea Young, Millard C. Farmer, Pamela L.J. Arangno, Atlanta, Ga., for petitioner-appellee.

Before TJOFLAT * and CLARK, Circuit Judges, and TUTTLE, Senior Circuit Judge.

TUTTLE, Senior Circuit Judge:

## I. APPEALABILITY OF DISTRICT COURT'S ORDER

■ Following the publication of our opinion in this case at 737 F.2d 925 (11th Cir.1984), the Court withheld the mandate *sua sponte* to give further consideration to the appealability of the district court's grant of the writ of habeas corpus. In that opinion, we announced what amounted to a new procedural rule touching upon the finality of judgments of habeas courts which enter judgments on some, but less than all, the "claims" before them. That rule is that each ground or basis which a habeas petitioner assigns as a ground or reason for the grant of the writ is a separate "claim" within the meaning of Fed.R.Civ.P. 54(b) [1] and that if the habeas court either

---

* TJOFLAT, Circuit Judge, dissented and filed separate opinion.

1. This Rule provides as follows:

(b) *Judgment Upon Multiple Claims or Involving Multiple Parties.* When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment. In the

grants the petition or denies it by deciding some, but not all, of the issues presented, the judgment of the Court is not a final judgment and therefore this Court lacks jurisdiction to entertain the appeal under U.S.Code, Section 1291.[2]

Since, as we recognized in our prior opinion, "The Federal Rules of Civil Procedure do not always apply to habeas proceedings," we undertook to consider their applicability to the appeal in this case. The issue was not raised by either party and was, of course, not briefed.

Upon further consideration, we have concluded that our prior opinion should be vacated.

We perceive a substantial difference between the finality of a judgment by a district court *granting* the writ of habeas corpus on two of several grounds and of a judgment denying the writ on the basis of the court's determining the sufficiency of less than all of the asserted grounds. The only question we have before us on appealability is of the former kind of order.

We now conclude that a judgment ordering the release of a convicted defendant unless the state should retry him within a specified time "ends the litigation and leaves nothing for the court to do but execute the judgment." *Catlin v. United States*, 324 U.S. 229, 233, 65 S.Ct. 631, 633, 89 L.Ed. 911 (1945).

Since both parties here were faced with a judgment that gave the petitioner all he could hope to achieve by the litigation and the state was required to hold a new trial or release the petitioner, it would defy logic for us to hold that such a judgment was not final within the meaning of 28 U.S.C. § 1291.

We arrive at this conclusion without reaching the question whether each separate ground alleged as a basis for granting the writ is a "claim" under Rule 54(b) and without reaching the question whether, assuming it is, Rule 54(b) should be adhered to in a case in which the district judge *denies* the writ on one or more, but less than all, the claims. Those two questions remain for a later day when they are presented to the Court in an actual case and they are fully briefed by the parties.

## II. STATEMENT OF THE CASE

This is an appeal by the State of Georgia from the grant of the writ of habeas corpus to Joseph James Blake, following his conviction of murder in the first degree and sentence to death in the Superior Court of Chatham County, Georgia. The procedural history of this case, demonstrating that all state remedies have been exhausted may be found in the report of the district court's opinion at *Blake v. Zant*, 513 F.Supp. 772 (S.D.Ga.1981).

As stated by the habeas court, "the circumstances leading up to the death of Tiffany Loury [aged two] are generally not in dispute." The habeas court stated the facts as follows:

In November 1975, Jacquelyn Loury and the decedent child were living with her mother, Mrs. Florence Smith, and several of Mrs. Smith's other children. Jacquelyn and Mr. Blake had dated for about nine months and planned to be married. The petitioner asked Jacquelyn to go out with him the evening of November 14, 1975, but she told him that she planned to go out with a girlfriend, Denise Walker, instead. Nonetheless, Mr. Blake persisted and, finally, after meeting her at the Walker home, Jacque-

---

absence of such determination and direction, any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.

Fed.R.Civ.P. Rule 54(b).

**2.** This section provides as follows:

The courts of appeals shall have jurisdiction of appeals from all final decisions of the district courts of the United States. . . .

28 U.S.C. § 1291.

lyn agreed to let the petitioner take her out drinking.

Jacquelyn's mother kept Tiffany while Jacquelyn, Ms. Walker, the petitioner and several other persons went first to one bar and then another. During the course of the evening, a dispute developed between Mr. Blake and Jacquelyn, perhaps because of her interest in another man. Petitioner struck Ms. Loury on the side of the head with his fist. He was ejected from the lounge at that time and again around midnight when he tried to return.

Mrs. Smith testified that Tiffany and the other children had gone to bed shortly after 9:30 p.m. Mrs. Smith left the house to visit friends around 10:15 p.m. and returned about two hours later. She then noticed that the window next to the front door had been opened, and the curtains pulled back. However, Mrs. Smith did not believe anything was seriously amiss at that time. At approximately 1:00 a.m., Mr. Blake called Mrs. Smith. He asked whether Jacquelyn was home. When told that she was not, Mr. Blake informed Mrs. Smith that he had taken Tiffany. Mrs. Smith began scolding him for having the child out so late on a cold evening. Mr. Blake then hung up without saying anything more. However, it did not appear that Mr. Blake's having the child was in itself a source of major concern. He had taken the child out alone several times in the past, and his relations with her as well as the rest of the family had been good.

Petitioner testified that, after he had been thrown out of the bar the second time, he had gone back to Jacquelyn's home. When no one answered, he opened the window, unlocked the door, and entered. He found everyone except Tiffany asleep. Mr. Blake testified that he asked Tiffany if she wanted to go with him. She agreed and they left by the back door. Mr. Blake indicated that his intention was to take the child away because her mother did not deserve the child and had mistreated her in a variety of respects.

Mr. Blake testified further that he first intended to run away with Tiffany and, accordingly, crossed the Talmadge Memorial Bridge as the quickest exit route. Mr. Blake stated that he drove as far as Buford, South Carolina. However, he realized at some point that he could not simply run away with the child without being chased by the authorities. Initially, he reacted to this fact by deciding to kill himself and Tiffany there in Buford. Petitioner later decided to return to Savannah. He testified that he stopped on the bridge. There he and Tiffany prayed about going to "another world" and being together forever "on the other side." Petitioner then dropped the child off the bridge to her death, which occurred on impact or very shortly thereafter.

Mr. Blake explained that he postponed his own trip to "the other side" so that he could tell the child's mother what had happened and why. Thus, petitioner did not in fact make any effort to conceal his actions. Quite the opposite, he contacted the police almost immediately after the incident, and began giving them substantially the same account of Tiffany's death that he testified to at trial, emphasizing that "I know I did wrong, but in another way I did right," while never once indicating that the child had been harmed or killed.[3]

The state's brief in this Court quotes from Blake's testimony at trial and says that the exact words used by Blake and Tiffany just before he stopped the car on the bridge were: "Would you like to go and stay with me forever?" She replied: "Yes." The appellee replied: "Okay. That's what we'll do. Nobody won't bother us again." The brief then says: "Then he stopped the car. The appellee and the child then got out of the car and knelt down and prayed at the bridge about going into another world on the other side. Then he told

---

**3.** Blake later testified that he meant Bluffton, rather than Buford, South Carolina.

the child: "I'll send you first and I'll be along shortly after."

Although quoting this language from Blake's testimony, the state's brief appears to accept it as a true statement of what actually occurred.

Within six or seven hours after the baby's death, Blake gave a full taped confession to the investigating officer after adequate warnings had been given. At this time, Blake stated that he did not want or need a lawyer because "he wouldn't be around." This statement, after describing his actions as outlined above, said:

All I know is I did wrong and in another way I did right. At least the baby don't have to suffer about it because the mama and/or the real father ain't fit to have a child like that. The baby is too good for any one of us. She is in a better place now.

Subsequently, within two or three days, while in jail, Blake wrote the following note, which was delivered to the jailer:

To Whom That Every Read This Letter, I have done the right thing by turning myself in, but I have a promise to keep to my little girl Tiffany. I told her that I would join her soon. But now the time has come for me to go to her. She came to me and said she wanted me now. So I must go because I promised Tiffany and I love her. That we'll be together on the other side. So you see and understand that I never lost her cause she is wait for me. I'm just sorry that Jackie won't be there with us. Me and Tiffany will live

in peace now forever. I will go to her now. May god forgive me for all my sins. Joseph James Blake.

Some two weeks later, the trial court ordered a psychiatric examination for him. Following the then current policy for indigent defendants in Chatham County,[4] Blake was taken to Central State Hospital in Milledgeville, Georgia, for examination in the state-operated facility for the criminally insane. The stated purpose of this examination was to determine: (1) the defendant's psychiatric condition at the time of the crime; (2) whether the defendant was competent to stand trial; (3) recommendation for treatment; (4) any mitigating circumstances which might be present.

A police report describing the incident was given to Dr. Bosch. However, neither the taped confession nor the handwritten letter was given to the psychiatrist to aid him in his examination, although they were in the hands of the state when he was appointed by the court. Additionally, neither of them was given to defense counsel, nor was he made aware of their existence until the day before the trial on February 13, 1976.

Dr. Miguel Bosch, the examining psychiatrist,[5] was called by the State. This highlights the fact that both the state and the defense realized that sanity was the only issue in the case. He found Blake competent to stand trial although suffering from a "reactive-depressive" condition, which the doctor attributed to his difficult position.

---

4. This policy has now changed. A trial court may now permit appointment of a private psychiatrist at public expense for an indigent defendant.

5. Dr. Bosch gave the following description of his credentials:

I finished Medical School at the University of Havana, Cuba in 1954. I practiced medicine in my country until 1960. I came to the United States in 1961. I went to the School of Medicine, University of Miami, Took an examination that was given by the Medical Association and I have a diploma from there. Also, I took an examination from the Medical Board of the Examiner of Georgia and I'm a licensed physician to practice medicine and

surgery in the State of Georgia.... Also, I went to work at Central State Hospital in 1963 as a regular M.D. in that association until 1965. In 1965 I went into the psychiatric training which I finished in July, 1968. At that time I was given a diploma as a Psychiatrist. After that I was appointed Assistant Chief of the Psychiatric Services, Central State Hospital. And, after that when I complete my two year of clinical psychiatrist I was considered more eligible to the American Psychiatric Association. And, my present position at Central State Hospital is the Director of the Forensic Center, which is the maximum security hospital, Central State Hospital.

Later, at the trial, Dr. Bosch described the condition:

He was depressed; he was tense; he have problem in his sleeping; he seemed to have some problem in concentrating; and, also, problem with his memory.... He seemed to be having some feeling of guilt about what he was going through.... He had a hopeless feeling about himself.

In response to a question posed by the state at the trial whether he found anything in his examination to indicate that Blake hated Jacquelyn, the mother of the dead child, Dr. Bosch answered: "No, I believe he was in love with her."

The most significant thing about the report, however, was the fact that Dr. Bosch stated:

That as far as his condition of the alleged offense, I do not have an opinion. I didn't say that he was sane or insane. I said I don't have an opinion because I couldn't get any information from him. He claimed he had no memory of doing anything wrong. He said he lacked memory about the particular incident. And then for that reason I could not formulate an opinion about his condition at the time of the offense.

Thus, with both parties and the court aware that the only issue in the trial was insanity at the time of the act, the court proceeded to trial with no psychiatric evidence on that point.

At the federal court habeas hearing, Blake's counsel, Reginald C. Haupt, Jr., testified that in private conversation he personally sought appointment by the trial court of a private psychiatrist to examine his client, but was told that only a state employed psychiatrist would be provided and, further, that formal motion for private examination would be both unwelcome and unavailing. He also testified that the financial circumstances of Blake's family were too limited for him to ask for their assistance and that his personal experience

with local physicians had convinced him that no useful testimony or examination could be obtained without payment.

Thus, the trial started with the only professional statement relative to the sanity of the defendant at the time of the commission of the act being a statement by the state psychiatrist that he was unable to determine that fact.[6] It later developed at the trial that the only evidence Dr. Bosch had before him at the time he made this statement was a copy of the arresting officer's report and an interview with the defendant who he said was unable to remember anything that happened at the time.

The two statements by Blake were totally inconsistent with the premise that he had no recollection of the events of the night of November 14–15. Instead, however, of the psychiatrist having an opportunity to see these documents, and make such use of them as he might to comply with the court's direction that he determine Blake's sanity, the only use that could be made of them in Blake's behalf was for his counsel to question the psychiatrist in cross-examination at the trial.

### III.  ISSUES PRESENTED

The state challenges the district court's holding that, in a capital case, a defendant whose sanity at the time of the alleged crime is fairly in question, has *"at a minimum* the constitutional right to at least one psychiatric examination and opinion developed in a manner reasonably calculated to allow adequate review of relevant, available information, and at such a time as will permit counsel reasonable opportunity to utilize the analysis in preparation and conduct of the defense."

The second issue is the correctness of the district court's finding as to the "reasonably effective assistance" of counsel that it was "confronted with conduct that falls far short of the requirement that reasonably

---

**6.** In response to the question: When he [Blake] was talking with you was he—did he appear to be under the influence of alcohol?, the arresting officer said: "No, not really. He seemed reasonably sane."

adequate assistance in fact be rendered at the sentencing hearing."

### A. *Availability of Psychiatric Evidence*

In discussing this issue, it is important to note what is not involved. In the first place, the trial court was not faced with the right of a defendant to ask for successive appointments at state expense of psychiatrists in order to obtain the kind of report that would be favorable to him. *Cf. United States ex rel. Smith v. Baldi,* 344 U.S. 561, 73 S.Ct. 391, 97 L.Ed. 549 (1953); *McGarty v. O'Brien,* 188 F.2d 151 (1st Cir.1951). As stated by the district court:

> However in the present case, this court does not find only objection to a particular psychiatrist or to use of publicly employed psychiatrists *per se.* Similarly, petitioner does not advance any demand for multiple opinions in the face of already abundant evidence. *Here, it appears that no expert opinion at all was received on the central issue of petitioner's mental state at the time of the alleged crime.* It further appears that almost no lay opinion on this critical issue was received.... (emphasis added.)

The second thing not involved in the issues here is the burden of proof. Neither party here discusses the question as to who has the burden of proving the defendant's mental condition at the time of the commission of the act. The state, therefore, seems to concede that the defendant in such a case where the issue of sanity is fairly raised is entitled to have an adequate psychiatric evaluation of his state of mind, contending only that the defendant here got what he was entitled to by the time the trial was completed.

Third, since we conclude upon a careful reading of the record, that even after the cross-examination of the psychiatric witness at the trial, he was still unable to give an opinion as to the sanity of the defendant, we are not faced with the issue of the correctness of a decision that the defendant was sane.

Finally, the state makes no contention that there was either a failure to exhaust state remedies or that petitioner was barred from relief because of a procedural default.[7]

■ Then, what is before us for decision is whether the defendant was denied a federal constitutional right "to at least one psychiatric examination and opinion developed in a manner reasonably calculated to allow adequate review of relevant, available information, and at such a time as [would] permit counsel reasonable opportunity to utilize the analysis in preparation and conduct of the defense."

In approaching this question, we must remember that the confession contained the statement by Blake "in another way I did right," in light of the psychiatrist's answer to the following questions at trial:

Q. If when the defendant dropped the child from the bridge and he thought he was doing something right but knew full well that he was dropping child off a bridge, would that be temporary insanity?

A. I say so.

Q. You think so?

A. Yes.

Q. In his own mind, you said that he felt that he was doing right?

A. I believe so.

We must also remember that in the letter not furnished to Dr. Bosch, written by Blake several days after the incident, he made the statement that "Tiffany came to me and said she wanted me now so I must go because I promised Tiffany and I love her. That we'll be together on the other side. So you see and understand that I never lost her cause she is waiting for me" and further, "I will go to her now." It hardly seems likely that a psychiatrist would not also have stated that if Blake in fact believed that Tiffany had "come to him" after her death this would be equally strong evidence of at least "temporary insanity." We also must bear in mind the

---

**7.** This issue discussed in the dissenting opinion is therefore not before us.

fact that Blake did actually attempt suicide, and was thereafter kept under constant surveillance while in jail to prevent a further attempt by him on his own life.

We, of course, do not know whether the psychiatrist, if he had these statements before him and an opportunity further to question the accused, would have found them accurately to state Blake's belief and, if so, whether he would have determined that Blake was insane at the time of the act. We hold, however, that the statements at least raise sufficient question as to Blake's sanity that they should have been presented to the psychiatrist early enough to allow adequate consideration of them in preparation of his evaluation. As stated by the district court:

Moreover, it is obvious that the state made little or no effort to supply Dr. Bosch and apparently Mr. Haupt as well with such information as the defendant had already voluntarily provided. The state's failure to produce the transcript of November 15, 1975 was hardly cured by events at trial. Careful analysis of the defendant's statement would surely require more than a single reading. Yet this one reading was apparently the only expert analysis of the petitioner's obviously quite bizarre account of the incident that has ever occurred. The court finds such analysis wholly inadequate, especially where there is little or no indication that serious efforts were made to obtain petitioner's own firsthand statement after the initial interview had failed. Given petitioner's willingness to discuss the incident on many other occasions, there is no obvious basis for believing that such efforts would have been futile.

The court finds that, in this case, reasonable efforts were not made to examine the petitioner with respect to his sanity at the time of the alleged crime. The court further concludes that, even were it impossible to interview the petitioner directly with respect to the incident, reasonable efforts were not made to provide Dr. Bosch with alternative means for consideration of the petitioner's condition. Consistent with this determination, the court must also conclude that Mr. Haupt was not provided with adequate expert assistance in the preparation of his case. Apparently, he was afforded no professional opinion on the question of Mr. Blake's sanity at the time of the incident until Dr. Bosch's comments were received on the witness stand at trial. At this point, with the presentation of evidence more than half complete and the theory of his defense already outlined for the jury, it was obviously too late for any significant benefit.

In sum, we conclude that on the facts of this case, Blake had the constitutional right posed by the above question and we agree with the district court that the right was denied him.

This conclusion is fully supported by the most recent Supreme Court decision dealing with the state's obligation in a criminal case "to assure that the defendant has a fair opportunity to present his defense." *Ake v. Oklahoma*, —— U.S. ——, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). In *Ake* a defendant in a murder trial had demonstrated bizarre conduct on arraignment and the trial court had him sent to a state psychiatric hospital for a determination as to his ability to stand trial. He was placed on medication and sent back for trial after several months. Thereupon Ake noted his defense to be that of insanity at the time of the commission of the killings. At no time had any psychiatrist made any inquiry into Ake's sanity at the time of the acts he was charged with, although his counsel moved for appointment of a psychiatrist.

The court, after discussing the potential help that might be provided by a psychiatrist, stated:

We therefore hold that when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the state must, *at a minimum*, assure the defendant access to a competent psychiatrist *who will conduct an appropriate examination and assist in evaluation, prep-*

*aration, and presentation of the defense.* This is not to say, of course, that the indigent defendant has a constitutional right to choose a psychiatrist of his personal liking or to receive funds to hire his own. Our concern is that the indigent defendant have access to a competent psychiatrist for the purpose we have discussed, and as in the case of the provision of counsel we leave to the states the decision on how to implement this right. —— U.S. at ——, 105 S.Ct. at 1097 (emphasis added).

The habeas court associated the effect of the actions by the state court, the prosecution and the psychiatric witness with the issue of effectiveness of counsel. The court cited *United States v. Edwards,* 488 F.2d 1154 (5th Cir.1974), stating that the courts have "long recognized a particularly critical interrelation between expert psychiatric assistance and minimally effective assistance of counsel." 488 F.2d at 1163. The same concept has been stated in a state case: "In *McCollum v. Bush,* 5 Cir. 1965, 344 F.2d 672, we affirmed a decision holding that a state's action in adjudicating an indigent defendant guilty without honoring his request for the assistance of psychiatric experts denied [him] both a fair trial and the effective assistance of counsel." *Pedrero v. Wainwright,* 590 F.2d 1383, 1396 (5th Cir.1979).[8]

So, too, does the Supreme Court seem to equate the need for psychiatric aid to assistance of counsel. —— U.S. at ——, 105 S.Ct. at 1093, citing *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); *Douglas v. California,* 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963); *Evitts v. Lucey,* —— U.S. ——, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985); and *Strickland v. Washington,* —— U.S. ——, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

We note that the Supreme Court has recently provided guidance in the resolution of a criminal defendant's claim of inef-

fectiveness of counsel. In *United States v. Cronic,* —— U.S. ——, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), the Court held that unless the surrounding circumstances justify a presumption of effectiveness, the inquiry must focus on counsel's actual performance at trial in order to ascertain whether counsel failed to function adequately as the government's adversary. 104 S.Ct. at 2048.

In a companion case, *Strickland v. Washington, supra,* the Court announced a two-pronged test to be applied in ascertaining whether errors committed by a defendant's counsel amounted to ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

104 S.Ct. at 2064.

In *Cronic,* the Court concluded that a determination of whether counsel's actual performance was constitutionally deficient requires an examination of specific errors in light of the test set forth in *Washington. Cronic,* 104 S.Ct. 2051 n. 41.

In this part of the habeas corpus petition, the appellee is not alleging acts on the part of his counsel which fell below constitutionally acceptable standards. Thus, *Washington,* which focuses on allegations of substandard representation, does not directly apply. Rather he is alleging actions on the part of the state which made it impossible for his counsel to render meaningful assistance on the issue of the appellee's sanity. Our inquiry must therefore begin by focusing on the effect of the

---

**8.** Contrary to the statement in the dissent that we fashion a rule for every criminal case, we make a decision solely *on the facts of this case,* in which the sanity of the defendant was fairly raised and which demonstrated the withholding of evidence from the psychiatrist which at trial he testified was "psychiatrically significant."

challenged actions upon the adversary process: did they so completely deprive Blake of the right "to require the prosecution's case to survive the crucible of meaningful adversarial testing," *Cronic*, 104 S.Ct. at 2047, as to make the outcome of the trial presumptively unreliable.[9]

We believe that it did. Blake's sanity at the time of the alleged crime was fairly in question. Indeed, it was the only material issue presented to the jury on the question of guilt. At counsel's request the trial judge ordered a psychiatric evaluation of the defendant as to both his competency to stand trial and his sanity at the time of the offense. Dr. Bosch interviewed the defendant and stated that he could reach no conclusion on the question of sanity at the time of the offense, largely because in the interview Blake could not remember anything about the crime. Thus, although Dr. Bosch was under a court order to express an opinion as to Blake's sanity at the time of the offense, he had no factual information on which to base such an opinion, other than that provided in the police report, which he found insufficient. At the same time the police possessed two pieces of evidence—the tape of the confession and the suicide note—which Dr. Bosch later, at trial, indicated were highly relevant, or psychiatrically significant, on the question of Blake's sanity. Nevertheless, neither of these pieces of evidence was made available to defense counsel until the day before the trial, or to Dr. Bosch until he testified.[10] Meanwhile, the trial court had made it clear to Blake's attorney that any motions for further psychiatric evaluation in order to obtain an opinion about Blake's sanity at the time of the offense would not be entertained.

Thus, Blake and his attorney were left with virtually no evidence on which to base a defense of insanity until the day before trial, though highly significant evidence relevant to that issue had been in the hands of the police since shortly after Blake's arrest. Under these circumstances, we do not hesitate to find that the state so materially

---

**9.** The Supreme Court has found state interference with the assistance of counsel presumptively unconstitutional in a variety of circumstances. *See, e.g., Geders v. United States,* 425 U.S. 80, 91, 96 S.Ct. 1330, 1336, 47 L.Ed.2d 592 (1976) (order prohibiting defendant from consulting with counsel during overnight recess); *Herring v. New York,* 422 U.S. 853, 865, 95 S.Ct. 2550, 2556, 45 L.Ed.2d 593 (1975) (refusal to permit defense attorney to make closing arguments in criminal bench trial); *Powell v. Alabama,* 287 U.S. 45, 71, 53 S.Ct. 55, 65, 77 L.Ed. 158 (1932) (failure to appoint specific counsel for indigent capital defendants prior to commencement of trial).

**10.** Further support for our holding in this case can be found in the case of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and its progeny. In *Brady* the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. at 1196. As the Court made clear in *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) the absence of a request is not necessarily fatal to a *Brady* claim. In this case, the judge's order of a psychiatric examination placed a duty upon the prosecution to provide the doctor and the defense with the transcript of the confession and the suicide note. This information was certain-

ly material in that it indicated Blake's state of mind at the time closest to the incident.

The prosecution did, however, release this information to the defendant the day before trial. In some instances that may be sufficient. *See Weatherford v. Bursey,* 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977) (names of witnesses can be disclosed on the day of trial). However, as other courts have recognized, some material must be disclosed earlier. *See Grant v. Alldredge,* 498 F.2d 376, 381 (2d Cir.1974); *United States v. Donatelli,* 484 F.2d 505 (1st Cir.1973). This is because of the importance of some information to adequate trial preparation. In this case, the information was critical to trial preparation. It not only affected the psychiatrist's report, but also the defense's ability to present an adequate insanity defense. Dr. Bosch testified he could not give an opinion as to Blake's sanity at the time of the crime due to a lack of information. Obviously, he was reluctant to give an opinion when confronted with this information for the first time on the witness stand. Had the prosecution disclosed the material it had in its possession, Dr. Bosch would not have been in this situation and possibly could have rendered an opinion. We further note that the state's disclosure of the police report, while simultaneously withholding the confession and the suicide note, is indicative of bad faith on the part of the prosecution.

interfered with the defendant's ability "to require the prosecution's case to survive the crucible of meaningful adversarial testing" as to raise a presumption that the defendant's counsel could not have been able to provide effective assistance as required by the Sixth and Fourteenth Amendments. *See Cronic*, 104 S.Ct. at 2047. Moreover, we do not believe that the extreme prejudice caused by the state's actions was cured by the opportunity given to defense counsel to cross-examine Dr. Bosch on the basis of the confession and the letter. This was hardly an adequate substitute for a psychiatric opinion developed in such a manner and at such a time as to allow counsel a reasonable opportunity to use the psychiatrist's analysis in the preparation and conduct of the defense.

B. *Ineffectiveness of Counsel at the Sentencing Hearing*

The district court also vacated the sentence of death on the ground that trial counsel's service to Blake at the sentencing hearing fell "far short of the requirement that reasonably adequate assistance in fact be rendered." 513 F.Supp. at 779.

█ Blake's defense counsel, Haupt, testified at the habeas hearing that he made no preparations whatsoever for the penalty phase of Blake's trial because he believed that Blake would be found not guilty by reason of insanity. It was his philosophy that a lawyer should try "to win [a case] rather than prepare for losing it." Only after the jury had retired did Haupt sense that his client would be found guilty. At that time he sought a continuance, which was denied.

As a result, Haupt went into the sentencing phase without any idea whether there was or was not mitigating evidence available which might persuade the jury not to impose a death sentence, other than the psychiatric evidence introduced during the trial.

As noted earlier, the Supreme Court's opinion in *Strickland v. Washington* enunciated a two-part test which must be applied in judging whether defense counsel's

errors amounted to ineffective assistance of counsel. 104 S.Ct. at 2064. We do not hesitate in agreeing with the district court that Blake has satisfied the first part of the test. It should be beyond cavil that an attorney who fails altogether to make any preparations for the penalty phase of a capital murder trial deprives his client of reasonably effective assistance of counsel by any objective standard of reasonableness.

This is not the end of the inquiry, for Blake must also demonstrate that he was prejudiced by his attorney's conduct. The district court determined that Haupt's error was prejudicial *per se* and that even if prejudice needed to be affirmatively proved, Blake had adequately shown that Haupt's ineffectiveness was prejudicial: "[n]evertheless, petitioner has made a credible, if hardly overwhelming, showing of prejudice." 513 F.Supp. at 780.

However, because the district court was without the benefit of *Strickland*, we must reexamine this conclusion in light of that case's holding. There the Court held, first, that "[c]onflict of interest claims aside, actual ineffectiveness claims alleging a deficiency in attorney performance are subject to a general requirement that the defendant affirmatively proved prejudice." 104 S.Ct. at 2067. The Court added that such claims "cannot be classified according to likelihood of causing prejudice." *Id.*

The Court also enunciated the proper standard for proving prejudice resulting from ineffective counsel:

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Id.* 104 S.Ct. at 2068.

█ We agree with the district court that a presumption of prejudice would be proper where counsel's representation was so deficient as to amount in every respect to no representation at all, *see Adams v.*

*Balkcom,* 688 F.2d 734, 739 n. 1 (11th Cir. 1982). However, we do not believe this is the case here, although this is a very close question. As Haupt acknowledged at the habeas hearing, the psychiatric evidence presented during the guilt phase of the trial was relevant not only to the issue of insanity but also to the question of mitigation in the determination of an appropriate penalty. Furthermore, there is no contention that Haupt did not build a reasonably cogent argument around the psychiatric evidence as a basis for mitigation; although no record of that argument exists. Thus, on balance, it probably cannot be said that Blake's defense during the penalty phase was a mere sham, amounting to no representation at all.

We must then turn to the question whether Blake has demonstrated actual prejudice—that is, whether it is reasonably probable that the jury would have imposed a lesser sentence, but for Haupt's failure to prepare for the penalty phase of the trial. We note that, in finding actual prejudice, the district court applied a harmless error standard, which is incorrect under *Strickland v. Washington.*

Upon an exhaustive search of the record, we nevertheless believe that Blake has adequately demonstrated a reasonable probability that he would have received a lesser sentence but for Haupt's complete failure to search out mitigating character evidence. As the district court found, "[p]etitioner has demonstrated that no favorable evidence was sought and that some was in fact available." 513 F.Supp. at 781. Haupt apparently did interview Blake's father on more than one occasion and there were other persons with the father during those interviews. It also appears that he met with both of Blake's parents at his office one time before the trial. This apparently was the extent of his investigation into character evidence which might be used for mitigation at a penalty proceeding.

■ At the habeas hearing, Blake proffered four persons, in addition to his mother, who could and would have testified to mitigating circumstances on his behalf but who were never contacted by Haupt. Three had known him since childhood. All could have testified to the effect that Blake was a man who was respectful toward others, who generally got along well with people and who gladly offered to help whenever anyone needed something. His mother also named four other persons who would have testified on Blake's behalf but who had since died.[11] We agree with the district court that:

> Mr. Haupt in no way used or even considered additional evidence which might have been available to support the defendant's cause. Such a performance hardly comports with the notion that the sentencing phase be in fact a distinct procedure where the jury's attention is focused not just on the circumstances of the crime, but also on special facts about this defendant that mitigate against imposing capital punishment!

513 F.Supp. at 780 (citations omitted).

■ The state insists that the absence of any mitigating evidence did not prejudice Blake because each of the witnesses would also have testified, if asked, that he or she knew that Blake had once been arrested on an assault charge in connection with the stabbing of his estranged wife, Charlesetta Blake, who was pregnant at the time. We believe that while this very well could have persuaded a jury to impose the death sentence in any event, Blake was nevertheless prejudiced by the absence of the character evidence. In fact, during the guilt phase of the trial, the state was permitted to introduce testimony by Charlesetta Blake concerning the altercation which had preceded the stabbing, though any testimony about the stabbing was excluded. Mrs. Blake testified that, in an attempt to compel her

---

**11.** Petitioner suggests that Haupt's failure to proffer his mother, Mrs. Bessie Blake, as a witness further prejudiced him because one of the jurors was a friend of Mrs. Blake who apparently did not recognize the petitioner as her

friend's son. This argument is wholly frivolous. In determining prejudice, we are required to presume jury impartiality. *Strickland v. Washington,* 104 S.Ct. at 2068.

to return to him, Blake had grabbed her two-year old son and held a knife to him, saying, "If I run this knife through this baby's heart, you'll come with me." Thus, the jury already knew much about the incident that was damaging to the defendant. The district court was correct when it noted that the available mitigating evidence "might have demonstrated to the jury that the petitioner was not the totally reprehensible person they apparently determined him to be. Certainly they would have provided some counterweight to the evidence of bad character which was in fact received." 513 F.Supp. at 780.

As we have already indicated, we find it a close question whether the petitioner received any defense at all in the penalty phase. Certainly he would have been unconstitutionally prejudiced if the court had not permitted him to put on mitigating evidence at the penalty phase, no matter how overwhelming the state's showing of aggravating circumstances. *See Lockett v. Ohio*, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964, 57 L.Ed.2d 973 (1978) (plurality opinion); *Bell v. Ohio*, 438 U.S. 637, 642, 98 S.Ct. 2977, 2980, 57 L.Ed.2d 1010 (1978). Here, Haupt's failure to seek out and prepare any witnesses to testify as to mitigating circumstances just as effectively deprived him of such an opportunity. This was not simply the result of a tactical decision not to utilize mitigation witnesses once counsel was aware of the overall character of their testimony. Instead, it was the result of a complete failure—albeit

prompted by a good faith expectation of a favorable verdict—to prepare for perhaps the most critical stage of the proceedings. We thus believe that the probability that Blake would have received a lesser sentence but for his counsel's error is sufficient to undermine our confidence in the outcome. Therefore, the decision of the district court is

AFFIRMED.

TJOFLAT, Circuit Judge, dissenting:

The threshold question presented by this appeal is whether, in a habeas corpus case presenting multiple claims for relief, a court of appeals has the authority to review an order of the district court which grants relief without disposing of all of the petitioner's claims. Supreme Court precedent answers this question: we are powerless to review a district court order granting the writ of habeas corpus unless the order finally disposes of all of the claims the petitioner has presented. *Andrews v. United States*, 373 U.S. 334, 340, 83 S.Ct. 1236, 1240, 10 L.Ed.2d 383 (1963); *Collins v. Miller*, 252 U.S. 364, 365, 40 S.Ct. 347, 347, 64 L.Ed. 616 (1920). The Supreme Court views the exacting standards of finality that govern appeals under 28 U.S.C. § 1291 (1982)[1] as applicable in habeas corpus cases as they are in other proceedings.

In his habeas petition to the district court in this case, the petitioner presented fifty-nine federal constitutional claims.[2] The

---

1. 28 U.S.C. § 1291 (1982) provides, in pertinent part:

    **§ 1291. Final decisions of district courts**
    The courts of appeals ... shall have jurisdiction of appeals from all final decisions of the district courts of the United States ... except where a direct review may be had in the Supreme Court.
    A final decision of the district court granting or denying a writ of habeas corpus is obviously a final decision described in section 1291.
    28 U.S.C. § 2253 (1982) also gives the courts of appeals authority to review, on appeal, "the final order" of a district court in a habeas corpus action brought by a state prisoner. The petitioning state prisoner may not prosecute an appeal, however, "unless the justice or judge who rendered the order [sought to be reviewed] or a circuit justice or judge issues a certificate of

probable cause." *Id.* This requirement operates to limit the court of appeals' appellate authority under both sections 1291 and 2253.

2. In his petition to the district court, petitioner did not present his claims in separate paragraphs. *See* Rule 2(c), Form of Petition, Rules Governing Section 2254 Cases (and accompanying Advisory Committee Note and form petition at paragraph 12), 28 U.S.C. fol. § 2254 (1982). *See also* Fed.R.Civ.P. 10(b); Rule 11, Federal Rules of Civil Procedure; Extent of Applicability, Rules Governing Section 2254 Cases, 28 U.S.C. fol. § 2254 (1982) (Federal Rules of Civil Procedure made applicable to habeas corpus proceedings to extent not inconsistent with the habeas rules and "when appropriate.") Rather, he combined many of his claims, especially those derived from common operative facts, in

a single allegation. Petitioner's habeas petition, as I read it, stated the 59 claims that follow; the first 12 attacked petitioner's murder conviction, the remainder challenged his sentence.

1. The trial court's imposition of petitioner's judgment of conviction denied petitioner due process of law, in violation of the fourteenth amendment, because it was based on evidence from which no rational trier of fact could have found petitioner guilty beyond a reasonable doubt.

2. The trial court denied petitioner a fair trial, in violation of the Due Process Clause of the fourteenth amendment, by refusing to provide petitioner's court-appointed attorney funds to hire an investigator and expert witnesses to assist in the preparation and presentation of his defense.

3. The trial court denied petitioner the effective assistance of counsel, guaranteed him by the sixth and fourteenth amendments, by refusing to provide petitioner's court-appointed attorney funds to hire an investigator and expert witnesses to assist in the preparation and presentation of his defense.

4. The trial court denied petitioner a fair trial, in violation of the Due Process Clause of the fourteenth amendment, by refusing to provide petitioner's court-appointed attorney funds to hire a psychiatrist to examine petitioner for the purpose of determining whether petitioner was insane when he committed the homicide charged and, if so, testifying to that effect at trial.

5. The trial court denied petitioner the effective assistance of counsel, guaranteed him by the sixth and fourteenth amendments, by refusing to provide petitioner's court-appointed attorney funds to hire a psychiatrist to examine petitioner for the purpose of determining whether petitioner was insane when he committed the homicide charged and, if so, testifying to that effect at trial.

6. The prosecutor denied petitioner a fair trial, in violation of the Due Process Clause of the fourteenth amendment, by preemptorily challenging, during the voir dire examination of the jury venire, every prospective juror having conscientious or religious scruples against capital punishment.

7. The prosecutor denied petitioner his sixth and fourteenth amendment right to a jury representing a fair cross section of the community by systematically excluding, in the exercise of his preemptory challenges, every prospective juror having conscientious or religious scruples against capital punishment.

8. The trial court denied petitioner a fair trial, in violation of the Due Process Clause of the fourteenth amendment, by excusing for cause, during the voir dire examination of the jury venire, persons having conscientious or religious scruples against capital punishment.

9. The trial court denied petitioner his sixth and fourteenth amendment right to a jury representing a fair cross section of the community by excusing for cause prospective jurors having conscientious or religious scruples against capital punishment.

10. Petitioner was denied the effective assistance of counsel, guaranteed him by the sixth and fourteenth amendments, because his court-appointed attorney failed timely to present claims 1 through 9 above to the Georgia courts.

11. Petitioner was denied the effective assistance of counsel, guaranteed him by the sixth and fourteenth amendments, because his court-appointed attorney failed to order counsel's closing arguments to the jury transcribed for appellate review.

12. The Georgia death penalty sentencing scheme operates as a denial of due process in violation of the fourteenth amendment, and thus could not be applied in petitioner's case, because it lacks a rational justification as a penal sanction.

13. The Georgia death penalty sentencing scheme is cruel and unusual, in violation of the eighth and fourteenth amendments, and thus could not be applied in petitioner's case, because it lacks a rational justification as a penal sanction.

14. The Georgia death penalty sentencing scheme is unconstitutional, and thus could not be applied in petitioner's case, because it systematically results in the imposition of death sentences on account of the accused's and/or his victim's race, sex, and socioeconomic status, in violation of the Due Process Clause of the fourteenth amendment.

15. The Georgia death penalty sentencing scheme is unconstitutional, and thus could not be applied in petitioner's case, because it systematically results in the imposition of the death sentence on account of the accused's and/or his victim's race, sex, and socioeconomic status, in violation of the eighth and fourteenth amendments.

16. The Georgia death penalty scheme is unconstitutional, and thus could not be applied in petitioner's case, because the state applies it in an arbitrary and capricious manner, in violation of the Due Process Clause of the fourteenth amendment.

17. The Georgia death penalty sentencing scheme is unconstitutional, and thus could not be applied in petitioner's case, because the state applies it in an arbitrary and capricious manner, in violation of the eighth and fourteenth amendments.

18. The Georgia death penalty sentencing scheme is unconstitutional, and thus could not be applied in petitioner's case, because its provisions for appellate review are fundamentally unfair, in violation of the Due Process Clause of the fourteenth amendment.

19. The Georgia death penalty sentencing scheme is unconstitutional, and thus could not be applied in petitioner's case, because its provisions for appellate review are fundamentally

unfair, in violation of the eighth and fourteenth amendments.

20. The trial court's imposition of petitioner's death sentence denied petitioner due process of law in violation of the fourteenth amendment, because it was based on evidence from which no rational trier of fact could have found the aggravating circumstance described in Ga.Code § 27–2534.1(b)(7) (now codified at Ga.Code Ann. § 17–10–30(b)(7).

21. The trial court's imposition of petitioner's death sentence was cruel and unusual, in violation of the eighth and fourteenth amendments, because it was based on evidence from which no rational trier of fact could have found the aggravating circumstance described in Ga. Code § 27–2534.1(b)(7) (now codified at Ga. Code Ann. § 17–10–30(b)(7).

22. Ga.Code § 27–2534.1(b)(7) (now codified at Ga.Code Ann. § 17–10–30(b)(7) ("The offense of murder ... was outrageously or wantonly vile, horrible, or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim"), which provided the aggravating circumstance on which the jury based its recommendation that petitioner receive the death penalty, is vague and overbroad, thus rendering petitioner's death sentence cruel and unusual, in violation of the eighth and fourteenth amendments.

23. Ga.Code § 27–2534.1(b)(7) (now codified at Ga.Code Ann. § 17–10–30(b)(7) ("The offense of murder ... was outrageously or wantonly vile, horrible, or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim"), which provided the aggravating circumstance on which the jury based its recommendation that petitioner receive the death penalty, is vague and overbroad, thus rendering petitioner's death sentence arbitrary and capricious, in violation of the Due Process Clause of the fourteenth amendment.

24. The trial court denied petitioner a fair sentencing proceeding, in violation of the Due Process Clause of the fourteenth amendment, in refusing to provide petitioner's court-appointed attorney funds to hire an investigator and expert witnesses to assist in the preparation and presentation of mitigating evidence.

25. The trial court denied petitioner the effective assistance of counsel, guaranteed him by the sixth and fourteenth amendments, by refusing to provide petitioner's court-appointed attorney funds to hire an investigator and expert witnesses to assist in the preparation and presentation of mitigating evidence.

26. The trial court denied petitioner a fair sentencing proceeding, in violation of the Due Process Clause of the fourteenth amendment, by refusing to provide petitioner's court-appointed attorney funds to hire a psychiatrist to examine petitioner for the purpose of preparing and presenting mitigating evidence.

27. The trial court denied petitioner the effective assistance of counsel, guaranteed him by the sixth and fourteenth amendments, by refusing to provide petitioner's court-appointed attorney funds to hire a psychiatrist to examine petitioner for the purpose of preparing and presenting mitigating evidence.

28. The trial court denied petitioner a fair sentencing proceeding, in violation of the Due Process Clause of the fourteenth amendment, by refusing to grant petitioner a continuance following the rendition of his guilty verdict so as to allow his court-appointed attorney time to prepare for the penalty phase of the trial.

29. Petitioner's death sentence is cruel and unusual, in violation of the eighth and fourteenth amendments, because the trial court refused to grant petitioner a continuance following the rendition of his guilty verdict so as to allow his court-appointed attorney time to prepare for the penalty phase of the trial.

30. The prosecutor denied petitioner a fair sentencing proceeding, in violation of the Due Process Clause of the fourteenth amendment, by peremptorily challenging, during the voir dire examination of the jury venire, every prospective juror having conscientious or religious scruples against capital punishment.

31. The prosecutor denied petitioner his sixth and fourteenth amendment right to a jury representing a fair cross section of the community by systematically excluding, in the exercise of his peremptory challenges, every prospective juror having conscientious or religious scruples against capital punishment.

32. The trial court denied petitioner a fair sentencing proceeding, in violation of the Due Process Clause of the fourteenth amendment, by excusing for cause, during the voir dire examination of the jury venire, persons having conscientious or religious scruples against capital punishment.

33. The trial court denied petitioner his sixth and fourteenth amendment right to a jury representing a fair cross section of the community by excusing for cause prospective jurors having conscientious or religious scruples against capital punishment.

34. The trial court denied petitioner a fair sentencing proceeding, in violation of the Due Process Clause of the fourteenth amendment, by imposing the petitioner's death sentence without considering mitigating evidence.

35. Petitioner's death sentence is cruel and unusual, in violation of the eighth and fourteenth amendments, because it was imposed without the jury's or the court's consideration of mitigating evidence.

36. The trial court denied petitioner a fair sentencing proceeding, in violation of the Due Process Clause of the fourteenth amendment, by failing to instruct the jury as to the mitigating circumstances disclosed by the evidence.

37. Petitioner's death sentence is cruel and unusual, in violation of the eighth and fourteenth amendments, because the trial court

failed to instruct the jury as to the mitigating circumstances disclosed by the evidence.

38. The trial court denied petitioner a fair sentencing proceeding, in violation of the Due Process Clause of the fourteenth amendment, by failing to instruct the jury as to the relationship between aggravating and mitigating circumstances.

39. Petitioner's death sentence is cruel and unusual, in violation of the eighth and fourteenth amendments, because the trial court failed to instruct the jury as to the relationship between aggravating and mitigating circumstances.

40. The trial court denied petitioner a fair sentencing proceeding, in violation of the Due Process Clause of the fourteenth amendment, by failing to instruct the jury that mitigating circumstances could outweigh aggravating circumstances and thus require the jury to recommend the imposition of a life sentence rather than the death penalty.

41. Petitioner's death sentence is cruel and unusual, in violation of the eighth and fourteenth amendments, because the trial court failed to instruct the jury that mitigating circumstances could outweigh aggravating circumstances and thus require the jury to recommend the imposition of a life sentence rather than the death penalty.

42. The trial court denied petitioner a fair sentencing proceeding, in violation of the Due Process Clause of the fourteenth amendment, by failing to instruct the jury that its sentencing recommendation was not advisory but, instead, was binding on the trial court or sentencer.

43. Petitioner's death sentence is cruel and unusual, in violation of the eighth and fourteenth amendments, because the trial court failed to instruct the jury that its sentencing recommendation was not advisory but, instead, was binding on the trial court or sentencer.

44. The trial court denied petitioner a fair sentencing proceeding, in violation of the Due Process Clause of the fourteenth amendment, because its charge to the jury indicated that petitioner would not be executed if the jury recommended the death penalty.

45. Petitioner's death sentence is cruel and unusual, in violation of the eighth and fourteenth amendments, because the trial court's charge to the jury indicated that petitioner would not be executed if the jury recommended the death penalty.

46. The trial court denied petitioner a fair sentencing proceeding, in violation of the Due Process Clause of the fourteenth amendment, because its charge to the jury, considered as a whole, was so inadequate as to render petitioner's sentencing proceeding arbitrary and capricious.

47. Petitioner's death sentence is cruel and unusual, in violation of the eighth and fourteenth amendments, because the trial court's charge to the jury, considered as a whole, was so inadequate as to render petitioner's sentencing proceeding arbitrary and capricious.

48. The trial court denied petitioner a fair sentencing proceeding, in violation of the Due Process Clause of the fourteenth amendment, because it gave petitioner a disproportionate sentence, one more severe than the sentences received by similarly situated offenders committing similar homicides.

49. Petitioner's death sentence is cruel and unusual, in violation of the eighth and fourteenth amendments, because it is disproportionate and more severe than the sentences received by similarly situated offenders committing similar homicides.

50. The trial court denied petitioner a fair sentencing proceeding, in violation of the Due Process Clause of the fourteenth amendment, by sentencing petitioner to death on account of his and/or his victim's race, sex, and poverty.

51. Petitioner's death sentence is cruel and unusual, in violation of the eighth and fourteenth amendments, because the trial court sentenced petitioner to death on account of his and/or his victim's race, sex, and socioeconomic status.

52. The Georgia Supreme Court denied petitioner a fair and adequate proportionality review of his sentence, in violation of the Due Process Clause of the fourteenth amendment.

53. Petitioner's death sentence is cruel and unusual, in violation of the eighth and fourteenth amendments, because the Georgia Supreme Court denied petitioner a fair and adequate proportionality review of his sentence.

54. The State of Georgia will deny petitioner due process of law, in violation of the fourteenth amendment, by putting him to death by electrocution.

55. The State of Georgia will impose cruel and unusual punishment upon petitioner by putting him to death by electrocution.

56. Petitioner was denied the effective assistance of counsel, guaranteed him by the sixth and fourteenth amendments, because his court-appointed attorney failed timely to present claims 12 through 55 above to the Georgia courts.

57. The petitioner was denied the effective assistance of counsel, guaranteed him by the sixth and fourteenth amendments, because his court-appointed attorney failed to move the trial court for a continuance after the rendition of the verdict of guilt so that he could prepare for the sentencing proceedings that followed.

58. The petitioner was denied the effective assistance of counsel, guaranteed him by the sixth and fourteenth amendments, because his court-appointed attorney failed to uncover and present to the jury and sentencing judge available evidence in mitigation.

59. Petitioner was denied the effective assistance of counsel, guaranteed him by the sixth and fourteenth amendments, because his court-appointed attorney failed to order the prosecutor's closing arguments to the jury transcribed for appellate review.

district court, following a brief evidentiary hearing, found that three claims had merit and granted the writ.[3] The court expressly declined to rule on petitioner's remaining claims.

It is clear from the district court's dispositive order, and the record, that petitioner did not expressly abandon any of the undecided claims. It is equally clear that the district court did not treat them as abandoned or otherwise dispose of them by, for example, dismissing them without prejudice. We are therefore faced with a case in which the trial court entered a "final judgment" without terminating the litigation.

The majority nonetheless holds that the order before us is a final appealable decision. The only way the majority can do so, in the face of the Supreme Court precedent I have cited, is to say that that precedent only governs habeas cases in which the district court has denied the writ or to view

the instant case as presenting only one claim. Neither argument has merit, and I therefore dissent.

I also dissent from the majority's treatment of the merits in this case. Petitioner failed seasonably to present to the Georgia courts two of the three claims the district court decided on the merits; he either asserted them in a "successive" habeas corpus petition or not at all. Because of this "procedural default," the Georgia courts have not and would not now decide these two claims.[4] The district court, and the majority, should have respected Georgia's enforcement of its procedural default rule by requiring, as a condition precedent to their entertainment of these particular claims on the merits, petitioner to show "cause" for not bringing them to the state courts in a timely fashion and resulting "prejudice."[5] Petitioner has failed to dem-

---

These claims, though not framed precisely as I have stated them, have been exhausted within the meaning of 28 U.S.C. §§ 2254(b) and (c) (1982). Claims 1, 16, 17, 20, 48, and 50 were presented to and decided by the Supreme Court of Georgia on petitioner's direct appeal from his conviction and death sentence. *Blake v. State,* 239 Ga. 292, 236 S.E.2d 637 (1977). Petitioner raised claims 12 through 19, 28 through 33, 48 through 51, 52, and 53 in his petition for a writ of habeas corpus to the Superior Court for Tattnall County, Georgia on March 7, 1978. That court, after an evidentiary hearing, denied the petition in a written order on August 17, 1978, and the Georgia Supreme Court, on January 11, 1979, refused to issue a certificate of probable cause to appeal. Petitioner presented claims 1, 6, 8, 12, 13, 16 through 20, 32, 48, 49, 52, and 53 to the Chatham County Superior Court (where he had been convicted and sentenced) in an extraordinary motion for a new trial on April 2, 1979. The court denied his motion following an evidentiary hearing on April 13, 1979, and the Georgia Supreme Court affirmed. *Blake v. State,* 244 Ga. 466, 260 S.E.2d 876 (1979). Petitioner's remaining claims were presented to the Georgia courts in his petition for a writ of habeas corpus to the Butts County Superior Court. That court refused to consider these claims on their merits, dismissing the petition as successive on September 2, 1980. The Georgia Supreme Court declined to review this disposition by denying petitioner a certificate of probable cause to appeal on September 4, 1980.

Two of the three claims decided by the district court in this case have never been raised by petitioner in any court. Petitioner did not

present them to the Georgia courts or set them forth in his petition to the district court. And he did not raise them at the evidentiary hearing below. They were not articulated, as far as I can discern, until the district court entered the order now before us. Nonetheless, these two claims, (1) that petitioner was denied due process of law because his state-provided psychiatrist's examination and resulting opinion as to his sanity at the time of the offense were inadequate and (2) that petitioner was denied effective assistance of counsel because the State's conduct prevented counsel from developing an insanity defense, must be deemed to have been exhausted for it is clear that the Georgia courts would not hear them on their merits.

3. *See supra* note 2.

4. *See supra* note 2.

5. The two procedurally defaulted claims are (1) that petitioner was denied due process of law because his court-appointed psychiatrist's examination and resulting opinion as to his sanity at the time of the offense were inadequate and (2) that petitioner was denied effective assistance of counsel because the State's conduct prevented counsel from developing an insanity defense. These claims were never presented to the Georgia courts, and petitioner did not raise them in his petition to the district court. *See supra* note 2. They first appeared in the district court's memorandum order granting the writ, *Blake v. Zant,* 513 F.Supp. 772 (S.D.Ga.1981).

The majority asserts that petitioner need not show "cause" for failing to present these two claims to the Georgia courts (and thus defaulting them) or resulting "prejudice," *see Wain-*

onstrate such cause and prejudice; accordingly, the two claims in question should have been denied. As for the merits of those claims, I find repugnant to precedent and to logic the majority's fashioning of new constitutional rules under the sixth amendment's "assistance of counsel" provision and the "fair trial" component of the Due Process Clause in vacating petitioner's conviction in this case. With respect to the third claim the district court decided, I would remand that claim to the district court with the instruction that it reconsider the claim under the Supreme Court's decision in *Strickland v. Washington,* —— U.S. ——, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

### I.

The final judgment rule is the dominant rule in federal appellate practice. *Di Bella v. United States,* 369 U.S. 121, 124–26, 82 S.Ct. 654, 656–57, 7 L.Ed.2d 614 (1962). In criminal cases, the insistence upon finality and the prohibition of piecemeal review is particularly important. *Id.,* 82 S.Ct. at 656–57; *see Cobbledick v. United States,* 309 U.S. 323, 324–26, 60 S.Ct. 540, 541–42, 84 L.Ed. 783 (1940). The same is true in habeas corpus proceedings. The Supreme Court stated in *Andrews v. United States* that "[t]he standards of finality to which the Court has adhered in habeas corpus proceedings [is] no less exacting [than in other cases]." 373 U.S. at 340, 83 S.Ct. at 1240. In *Collins v. Miller,* it held that for a judgment to be appealable it must be final "not only as to all the parties, but as to the whole subject-matter and as to all *the causes of action* involved." 252 U.S. at 370, 40 S.Ct. at 349 (emphasis added). *See also Andrews,* 373 U.S. at 340, 83 S.Ct. at 1240.

In *Collins v. Miller,* the petitioner was being held in federal custody on three extradition warrants based on three separate affidavits. He brought a federal habeas corpus action, and the district court determined that the writ should be denied as to one of the warrants. As to the other two warrants, the court referred the case for further hearing before the district judge who had ordered the petitioner's detention. The Supreme Court concluded that the district court's order was not a final appealable order because it disposed of only one of petitioner's causes of action. The Court stated: "To be appealable, the judgment must be, not only final, but *complete.*" 252 U.S. at 370, 40 S.Ct. at 349 (emphasis added).

Despite this precedent, the majority finds that the district court's order, disposing of only three [6] of petitioner's claims, or causes of action, is a final order, ripe for appellate review. As stated above, there are only two ways conceivably to square such a holding with this precedent: either the majority feels that this precedent only applies when the district court denies the writ or it views a habeas petition as one claim regardless of the number of discrete constitutional violations the petitioner alleges. Because this second argument is most quickly disposed of, I address it first.

---

*wright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), because the State has not pled petitioner's procedural default as a defense to those claims. The State could not have pled this defense below because the claims did not surface until the district court issued the writ. *See infra* notes 11 and 17. In fact, one could argue that the first claim did not surface until the majority fashioned its opinion. Under these circumstances, I suggest that the important federal-state policies served by the "cause" and "prejudice" rule, *see* Part II.B. *infra,* require us to apply the rule on our initiative.

**6.** The majority apparently reads the district court's dispositive opinion as deciding only two claims, both questioning the effective assistance of counsel. This is quite understandable because the district court stated that it was only deciding two ineffective assistance of counsel claims. *Blake v. Zant,* 513 F.Supp. 772, 776 (S.D.Ga.1981). But after demonstrating how the state-appointed psychiatrist's inadequate examination and opinion testimony had rendered petitioner's attorney ineffective, the district court went on to conclude that petitioner's "denial of expert psychiatric assistance was 'effectively a suppression of evidence violating the fundamental right of due process of law.'" *Id.* at 786. I therefore conclude that, in addition to the two ineffective assistance claims it mentioned, the district court also decided one of the due process claims petitioner had alleged, *see supra* note 2, claim 4, though framing it somewhat differently than petitioner did.

The argument that a habeas petition presents only one "claim" and that the various constitutional errors cited to support the claim constitute merely "grounds" for relief cannot be reconciled with Supreme Court precedent or with prevailing case law distinguishing "claims" from "grounds." As I have noted in discussing the Court's decision in *Collins v. Miller*, the petitioner there alleged that his detention, based on the three affidavits, was unlawful because he had been denied the right to present evidence to rebut the affidavits. The court denied the petition as it related to one of the affidavits and referred it to the judge who had ordered the petitioner's detention for further proceedings as to the other two affidavits. The Supreme Court held that each of the three deficiencies petitioner alleged in his habeas petition amounted to a separate claim and dismissed his appeal because only one of his claims had been disposed of by the district court. We should hold similarly here and dismiss this appeal, because fifty-eight of petitioner's claims have not been decided.[7]

In addition, the characterization of the constitutional violations presented in a habeas petition as separate "grounds" rather than separate "claims" is inconsistent with modern case law on this issue. First, it is clear that separate claims may be based on a single set of operative facts. *See Sears, Roebuck and Co. v. Mackey*, 351 U.S. 427, 436, 76 S.Ct. 895, 900, 100 L.Ed. 1297 (1956); 10 C. Wright, S. Miller, M. Kane, Federal Practice and Procedure § 2657 (2d ed. 1983). Thus, although some of petitioner's claims here may have arisen from the same set of operative facts, a characterization of them as "claims" is not negated. Moreover, the position that each constitutional violation presented in a petition constitutes a separate claim is consistent with the oft-cited definition of "claims" stated in *Rieser v. Baltimore and Ohio Railroad Co.*, 224 F.2d 198 (2d Cir.1955), *cert. denied*, 350 U.S. 1006, 76 S.Ct. 651, 100 L.Ed. 868 (1956). There, the Second Circuit held that "[t]he ultimate determination of multiplicity of claims must rest in every case on whether the underlying factual bases for recovery state a number of different claims *which could have been separately enforced.*" *Id.* at 199 (emphasis added). This definition has been cited with approval by this circuit. *Pitney Bowes Inc. v. Mestre*, 701 F.2d 1365, 1369 n. 8 (11th Cir.), *cert. denied*, —— U.S. ——, 104 S.Ct. 239, 78 L.Ed.2d 230 (1983). Indisputably, each of the fifty-nine claims presented by petitioner in the habeas petition before us could have been enforced by petitioner in a separate habeas corpus proceeding.[8] Each, therefore, constituted a separate claim for relief[9] which the district court was re-

---

**7.** The Supreme Court's *Collins* holding puts to rest the majority's contention that an order is final when the relief requested is finally settled. *Ante*, at 525. In *Collins*, the district court's denial of one of petitioner's claims meant that petitioner would remain incarcerated even if the district court were to decide that his other two claims had merit. Despite the fact that petitioner's custodial status could not possibly have been affected by the district court passing on the remaining two claims, the Supreme Court dismissed the case for want of a final order, pending the district court's determination on these two claims. So too here, despite the fact that the district court would have ultimately granted the writ, even if it had found petitioner's remaining 58 claims to be without merit, it was still required to dispose of these claims before the order became final. There is nothing in the Supreme Court's opinion in *Catlin v. United States*, 324 U.S. 229, 65 S.Ct. 631, 89 L.Ed. 911 (1945), cited by the majority to sup-

port its final judgment rationale, *ante*, at 525, that would counsel a different result.

**8.** Of course, the State would no doubt have moved the district court to dismiss every petition subsequent to the first one on the ground the petition was untimely, successive, or an abuse of the writ. *See* Rule 9, Delayed or Successive Petitions, Rules Governing Section 2254 Cases, 28 U.S.C. fol. § 2254 (1982).

**9.** The 59 constitutional claims stated in petitioner's habeas petition, *see supra* note 2, have a variety of factual bases, some mutually exclusive. For example, one claim challenges on due process grounds the sufficiency of the evidence to support petitioner's murder conviction. Two others challenge the sufficiency of the evidence to support the aggravating circumstance which triggered the imposition of petitioner's death penalty. Eight claims are based on the trial court's failure to provide petitioner's counsel

quired to dispose of if it wished to fashion a final appealable order.

Finally, if the majority, in an attempt to support its position that the district court's order was final, were to characterize the habeas petition before us as "one claim," with the fifty-nine constitutional violations petitioner alleges being defined as merely "grounds," it would be required to hold (although it expressly refuses to do so) that a decision of the district court *denying* a writ, because those constitutional errors it chose to consider were without merit, is a final order. For in such a situation the district court would have disposed of the "one claim" presented. To hold otherwise, the majority would be required to define an alleged constitutional violation as a "claim" when the writ is denied, but as a "ground" when the writ is granted. This would defy logic. Moreover, the treatment of a district court order *denying* the writ as final, even though it did not reject all of the petitioner's points of constitutional error as meritless, would directly conflict with the holding in *Collins v. Miller, supra.* The characterization of a habeas petition as one claim is, therefore, unsupportable.

We are thus left with the majority's only argument for reconciling its opinion with the definition of finality the Supreme Court set forth in *Andrews v. United States* and

*Collins v. Miller:* that this precedent was intended to apply only when the district court denies the writ. This argument dissolves, however, when one considers the important federal-state relations policies the final judgment rule fosters in habeas corpus cases; to carve out an exception to the final judgment rule for cases in which the district court grants the writ would do violence to these policies.

Habeas corpus proceedings are, by their nature, disruptive of a state's administration of its system of criminal justice. Until such proceedings have been concluded, they cast doubt on a prisoner's conviction and interfere with the state's administration of its corrections program. Our procedures for handling habeas petitions are designed, in part, to minimize such disruption. For example, our rules discourage untimely and successive petitions, *see* Rule 9, Delayed or Successive Petitions, Rules Governing Section 2254 Cases, 28 fol. § 2254 (1982), and we emphasize the importance of litigating *all* of a petitioner's claims in one habeas proceeding, both at the trial and appellate levels. *See Rose v. Lundy,* 455 U.S. 509, 520, 102 S.Ct. 1198, 1204, 71 L.Ed.2d 379 (1982) ("To the extent that the exhaustion requirement reduces piecemeal litigation, both the courts and the prisoner should benefit, for as a result the district

funds to employ an investigator, expert witnesses and a psychiatrist to assist counsel in the preparation and presentation of petitioner's insanity defense during the guilt phase of his trial and mitigating evidence in the sentencing phase. Eight other claims deal with the impaneling of the petit jury; petitioner contends that *Witherspoon* violations occurred and that, in addition, he was denied a jury representing a fair cross-section of the community.

Petitioner attacks the court's jury charge at the close of the sentencing phase of the trial on several discrete grounds, each of which, if valid, would require the vacation of his death sentence. He also attacks his sentencing and the Georgia Supreme Court's review thereof.

Petitioner raises several claims that are not even rooted in his criminal prosecution in the state superior court. He challenges the validity of the Georgia death penalty sentencing scheme on the basis of events that took place in other cases prior to his trial. Finally, petitioner contends that he was denied the effective assistance of counsel because the performance of his

court-appointed attorney failed to measure up to the minimum performance required under the Constitution.

It is true that some of petitioner's 59 claims share a common nucleus of facts, or stem from one transaction, and that one could argue that multiple claims stemming from one set of facts or transaction ought to be treated as one claim for our purposes. For example, petitioner alleges a denial of the effective assistance of counsel and of due process in the trial court's refusal to give him funds to hire a private psychiatrist. These are separate claims, however. They are not alternative; though their underlying facts are nearly identical, each states an independent claim for relief. But many of petitioner's claims do not stem from a common nucleus of facts or the same transaction. His attacks on the sufficiency of the evidence to support his conviction and on the Georgia death penalty scheme could not be more illustrative of this point. To treat these claims as one would be to ignore the precedent I have cited.

court will be more likely to review all of the prisoner's claims in a single proceeding, thus providing for a more focused and thorough review."); *Galtieri v. Wainwright,* 582 F.2d 348, 356 (5th Cir.1978) (en banc).

Obviously, these doctrines facilitate the administration of justice in the federal system as well as in the state's. First, they enable the federal system to conserve judicial and parajudicial resources, in that the trial and appellate courts need familiarize themselves with a petitioner's case but once. Second, as the Court in *Rose* emphasized, a one-proceeding treatment of a petitioner's case enables a more thorough review of his claims, thus enhancing the quality of the judicial product. In this respect, the petitioner and the state are the primary beneficiaries.

The majority's new final judgment rule will, if implemented, plainly impede the attainment of these important goals. In making this statement I acknowledge that the majority's result in this case appears, initially at least, to achieve these goals: the petitioner will receive a speedy trial and the finality of his state criminal prosecution will be accelerated. I submit, however, that it might not. There is always the possibility that the majority's result will be short-lived; it is subject to reversal by this court sitting en banc or the Supreme Court.

The majority apparently has not considered the mischief its rule will work in

cases in which the district court's grant of the writ is reversed.[10] In such cases, the district court, on remand, will have to refamiliarize itself with the petitioner's claims, and it could repeat the process we have here. It could pick and choose among the petitioner's remaining claims and litigate those appearing to be most meritorious. If it found one justifying the issuance of the writ, it could, in an effort to conserve time and resources for example,[11] leave the remainder for another day; hence, the tortuous cycle I have described could begin anew.

The foregoing analysis of the majority's new final judgment rule, which could be extended, makes it clear, I suggest, that the Supreme Court would apply its definition of finality, as set forth in *Andrews v. United States* and *Collins v. Miller,* to cases, like this one, in which the district court issues the writ on the basis of one or two of many constitutional claims. Accordingly, we should dismiss this petition for want of jurisdiction.

II.

Although I am convinced that we do not have a final judgment before us and therefore lack jurisdiction to entertain this appeal, I must address the majority's treatment of petitioner's claims. With respect to the two claims challenging petitioner's

10. In such a case, one might label the court of appeals' treatment of the merits tentative or provisional, especially if the district court, on remand, found, on reconsideration of the record previously compiled or following a new evidentiary hearing, that the facts on which the court of appeals' decision was based differed and called for a different conclusion of law. Tentative or provisional decision making by appellate courts has always been disfavored.

11. This is precisely what I believe happened in this case. The allegations of Blake's habeas corpus petition were framed in such a way that it was difficult for the district court to discern what his claims actually were. *See supra* note 2. From what I can determine from the record, the district court did not hold a pretrial conference, or employ any of the other techniques trial judges use to focus or narrow the issues, in an effort to define petitioner's claims. The case

simply proceeded to an evidentiary hearing. The hearing was brief. As I indicate in the text *infra,* petitioner's habeas counsel elicited the testimony of petitioner's trial attorney, Reginald Haupt, about the state superior court's policy, at the time of the murder trial, of not providing court-appointed defense counsel with funds to employ a psychiatrist to determine the defendant's sanity at the time of the offense. Habeas counsel also got Haupt to speculate that a privately hired psychiatrist probably would have helped him fashion and establish petitioner's insanity defense. But nowhere during the hearing did the court or, for that matter, the parties seek to define petitioner's claims more clearly. One thing is clear, though; no one articulated the ineffective assistance-due process claims concerning Dr. Bosch's examination and testimony that the district court, and the majority, have seized upon to vacate petitioner's conviction. *See supra* note 5.

conviction, I proceed first to the threshold procedural default—cause and prejudice issue,[12] then to the constitutional rules the majority has fashioned. I would not decide the third claim; it should be remanded for further proceedings.

## A.

In his habeas petition to the district court, petitioner presented fifty-nine claims; they are set out in the margin. *See supra* note 2. The district court decided only one of these, that petitioner was denied the effective assistance of counsel because his attorney failed to uncover and present mitigating evidence at the sentencing phase of his trial.[13] The district court also decided two claims petitioner did not present to the Georgia courts or raise in his petition:[14] that petitioner had been denied both the effective assistance of counsel and due process of law because, as a direct result of the State's conduct, the court-appointed psychiatrist's examination of petitioner and diagnosis of his mental state at the time of the offense were inadequate. Because these two claims had not been presented to the Georgia courts, the district court's first task, and ours as well, was to inquire whether the claims could be considered "exhausted," *see* 28 U.S.C. §§ 2254(b) and (c) (1982); for, if they were not, the dismissal of the petition was in order. *See Rose v. Lundy,* 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982) (district courts must dismiss mixed petitions, containing both exhausted and unexhausted claims); *Galtieri v. Wainwright,* 582

F.2d 348 (5th Cir.1978) (en banc). This inquiry was not made. Had it been made, it would have disclosed that these claims were exhausted, because it is clear that the Georgia courts would no longer consider them.[15] The superior court had already dismissed as successive a habeas corpus petition alleging claims closely akin to these[16] and, the Georgia Supreme Court having affirmed, would undoubtedly dismiss as successive another similar petition. In sum, the district court, after concluding the evidentiary hearing in this case, raised *sua sponte* and without notice to either party[17] two exhausted but procedurally defaulted claims.

A federal district court cannot entertain the merits of a procedurally defaulted claim on habeas corpus unless the court first determines that the petitioner had a justifiable reason for not having raised the claim in state court. In the case at hand, neither the district court nor the majority has acknowledged this rule. The Supreme Court has spelled out two ways in which the existence of such a justifiable reason can be established. In *Fay v. Noia,* 372 U.S. 391, 438, 83 S.Ct. 822, 849, 9 L.Ed.2d 837 (1963), the Court held that a justifiable reason will be presumed unless the State proves that the petitioner's procedural default constituted a "deliberate bypass" or "knowing waiver" of the state court review process. In *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), it held that a petitioner can be excused for not presenting his claim to the state courts

---

**12.** *See supra* note 5.

**13.** *See supra* note 2, claim 58.

**14.** *See supra* note 2.

**15.** For an explanation of the difference between waiver and exhaustion, see *Engle v. Isaac,* 456 U.S. 107, 125–26, 102 S.Ct. 1558, 1570–71, 71 L.Ed.2d 783 (1982), and *Darden v. Wainwright,* 725 F.2d 1526, 1535 n. 13 (11th Cir.1984) (en banc) (Tjoflat, J., dissenting).

**16.** *See supra* note 2, claims 2 through 5 and 24 through 27.

**17.** These two claims first appeared in the district court's dispositive order, 513 F.Supp. 772

(S.D.Ga.1981). *See supra* note 5. I find no indication in the record, including the transcript of the evidentiary hearing that, prior to publishing its opinion, the court gave the parties any notice that it was considering these claims. The State therefore had no opportunity prior to the entry of the court's dispositive order to argue that the court should not consider these procedurally defaulted claims without a demonstration by petitioner of justifiable reason for not having given the Georgia courts an opportunity to pass on them. Of course, the State could have raised this objection in a Fed.R.Civ.P. 59 motion to the district judge, but it apparently chose to appeal instead.

if he proves "cause" for his procedural default and resulting "prejudice." The question here is which of these tests should have dictated the district court's treatment of the two defaulted claims the district court and the majority have decided.

In *Fay v. Noia,* the Court held that a defendant who failed to appeal his state court conviction was not barred from prosecuting constitutional claims in a federal habeas action that he could have raised on appeal unless the State established that he had deliberately bypassed or knowingly waived his right to an appeal. Relying on *Fay,* the Court in *Kaufman v. United States,* 394 U.S. 217, 227 n. 8, 89 S.Ct. 1068, 1074–75 n. 8, 22 L.Ed.2d 227 (1969), said that this deliberate bypass test applied where a federal defendant took an appeal but failed to raise the claim he subsequently presented on collateral attack. This deliberate bypass test appears to have applied, with only rare exception,[18] in all procedural default cases until the Court's decision in *Wainwright v. Sykes.*[19]

In *Wainwright v. Sykes,* the Court reexamined the deliberate bypass test. Sykes, the petitioner, had violated Florida's contemporaneous objection rule by failing to object at trial to the introduction of his allegedly involuntary confession into evidence. He first raised his objection when, after an unsuccessful appeal, he moved the state trial court to set aside his conviction. That court refused to consider the objection, and thus denied petitioner's motion, on the ground that petitioner had waived it by not timely raising it at trial. On appeal, the Florida Supreme Court affirmed.

Sykes then sought federal habeas corpus review of the validity of his confession.

The district court, applying *Fay*'s deliberate bypass test, issued the writ, ordering the state trial court to hold a hearing on the voluntariness of his confession. We affirmed. *Wainwright v. Sykes,* 528 F.2d 522 (5th Cir.1976). On certiorari, the Supreme Court held that Sykes could not litigate the merits of his objection in federal habeas proceedings because he had not shown "cause" for failing to comply with Florida's contemporaneous objection rule and "prejudice" resulting from the admission of his confession into evidence. The Court rejected the "sweeping language" of *Fay v. Noia,* which previously might have been thought "to lay down an all-inclusive rule" that state procedural rules were "ineffective to bar review of underlying federal claims in federal habeas proceedings— absent 'knowing waiver' or 'deliberate bypass.'" *Wainwright v. Sykes,* 433 U.S. at 85, 87–88, 97 S.Ct. at 2505, 2507. The Court, however, did not disturb the application of the *Fay* test to its facts, failure to appeal; it rejected only the deliberate bypass test as it might apply in other contexts. *Id.* at 87–88 n. 12, 97 S.Ct. 2507 n. 12. The Court limited its *Sykes* holding to the facts before it, though, stating, in passing, that it would not "paint with a ... broad brush" as it had in *Fay v. Noia. Id.*

It is thus clear that the Court in *Wainwright v. Sykes* cut back significantly on the application of the "deliberate bypass," "knowing waiver" test to procedurally defaulted claims. It is also clear that a petitioner who has failed to comply with a state's contemporaneous objection rule must now demonstrate "cause" and "prejudice" before a federal habeas court can address his objection. The Court has yet to

---

18. In *Davis v. United States,* 411 U.S. 233, 93 S.Ct. 1577, 36 L.Ed.2d 216 (1973), the Court held that the petitioner must show "cause" and "prejudice" before a federal habeas court reviewing an application under 28 U.S.C. § 2255 (1982) will hear a claim with regard to which there had been a Fed.R.Crim.P. 12(b)(2) default (failure to challenge by motion before trial). In *Francis v. Henderson,* 425 U.S. 536, 96 S.Ct. 1708, 48 L.Ed.2d 149 (1976), the Court applied the *Davis* rule to the parallel case of a state procedural requirement.

19. *See, e.g., United States ex rel. Kenny v. Follette,* 410 F.2d 1276, 1278 (2d Cir.1969), *cert. denied,* 397 U.S. 940, 90 S.Ct. 951, 25 L.Ed.2d 120 (1970); *United States v. Pinto,* 394 F.2d 470, 474 (3d Cir.1968); *Hale v. Boles,* 419 F.2d 389, 389 (4th Cir.1969); *Pamplin v. Mason,* 364 F.2d 1, 6 (5th Cir.1966); *United States ex rel. Miner v. Erickson,* 428 F.2d 623, 625 (8th Cir.1970); *Curry v. Wilson,* 405 F.2d 110, 111 (9th Cir.1968), *cert. denied,* 397 U.S. 973, 90 S.Ct. 1090, 25 L.Ed.2d 268 (1970).

decide explicitly, however, whether the "cause" and "prejudice" test applies in the context here, where a petitioner invokes state remedial procedures but prevents the state courts from passing on his claim by failing to raise it seasonably. There is, however, good reason to believe that the Court, in a case such as ours, would apply the *Wainwright v. Sykes* test, rather than that of *Fay v. Noia.* Chief Justice Burger's concurrence in *Wainwright v. Sykes* and his subsequent opinion for the Court in *Jones v. Barnes*, 463 U.S. 745, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983), provide some guidance as to how the Court might resolve this issue.

In his concurrence in *Wainwright v. Sykes*, the Chief Justice stated that the "deliberate bypass," "knowing waiver" test applied only to fundamental decisions, such as whether to waive counsel, plead guilty, waive a jury, testify, or take an appeal, in which the defendant, with appropriate counseling, is competent to and should participate. 433 U.S. at 92, 97 S.Ct. at 2509. In this type of decision, a waiver test can readily, and feasibly, be applied. These decisions, with perhaps one exception—the decision to testify, are uniformly made after the trial judge has addressed the defendant in open court and are a matter of record, again perhaps with one exception—the decision to appeal. Whether the defendant has waived an objection in these situations is thus an issue that can easily be resolved by consulting the court's record or conducting a brief evidentiary hearing. By contrast, decisions which are generally entrusted to an attorney, such as what defenses to develop, when to object, which witnesses to examine, and what errors to cite on appeal or in a habeas petition, are either beyond the competence of even a "counseled" layman or must be made so immediately that the defendant could not knowingly and intelligently make a waiver. Thus, to apply the *Fay* test to these situations would be a useless act; for the State could rarely if ever prove a waiver. The *Fay* test is therefore unworkable in these instances.

In *Jones v. Barnes*, the Chief Justice, writing for the Court, expanded on this idea. There, the habeas petitioner claimed that his appellate counsel had been constitutionally ineffective because he had refused to raise on appeal several issues that petitioner felt had merit. The Court denied his claim. Citing his concurrence in *Sykes*, the Chief Justice stated that, although an accused has the right to make certain fundamental decisions, such as whether to plead guilty, waive a jury, testify on his own behalf, or take an appeal, he does not have the right to make his lawyer press certain claims on appeal, even if they are nonfrivolous. 463 U.S. at ——, 103 S.Ct. at 3312. He went on to state that such decisions are a matter of "professional judgment," *id.* at ——, 103 S.Ct. at 3314; only counsel has the superior ability to examine the record, research the law and marshal his client's arguments. *Id.* at ——, 103 S.Ct. at 3312. Drawing on the *Jones* opinion, one could make a cogent argument that the Court would apply the *Wainwright v. Sykes* "cause" and "prejudice" test to the situation presented in the case now before us because, as the Chief Justice pointed out in *Jones*, whether to raise a claim on appeal is a decision that only a lawyer is competent to make.

Putting aside, however, the argument that the application of the *Wainwright v. Sykes* and *Fay v. Noia* tests hinges on the type of "decision" involved, I believe the Supreme Court would apply the former test to the type of procedural default at hand because it provides a superior method for furthering several important federal-state relations goals implicated in habeas corpus proceedings. The *Wainwright v. Sykes* test was fashioned in large part to advance these goals; the *Fay v. Noia* test would frustrate them, especially in the situation here.

State procedural default rules which focus and bear directly on counsel's exercise of professional judgment, serve a salutary purpose in the administration of criminal justice. By requiring counsel to present his objections in an adequate and timely manner or else suffer their waiver, these

rules enable the state trial and appellate courts to deal with a litigant's objections at the most ideal moment, when the issue is fresh and the least onerous and costly remedy is available. These rules improve the quality of counsel's professional performance and of justice and bring finality to the cause. It requires no subtle analysis to conclude that the "deliberate bypass," "knowing waiver" test, applied to the briefing or argument of an appeal or the pleading and prosecution of a habeas petition would encourage unethical conduct and "sandbagging" by counsel, deprive the state courts of valuable tools for surfacing and dealing with federal constitutional issues, and make a mockery of the doctrine of finality in state criminal prosecutions. This prospect is, in my view, why we concluded in *Huffman v. Wainwright,* 651 F.2d 347 (5th Cir.1981), that the "cause" and "prejudice" test is applicable to the sort of lawyer decision making the Chief Justice referred to in *Wainwright v. Sykes* and *Jones v. Barnes.* There we held that a state prisoner, absent a showing of "cause" and "prejudice," could not raise a claim in federal habeas proceedings that he had failed to raise in his direct state court appeal from his conviction, in view of a Florida procedural rule that treated such a failure as a waiver.[20]

The procedural default rule the Georgia courts applied in the case at hand, the rule against successive petitions, deserves the same respect we gave the Florida waiver rule in *Huffman v. Wainwright.* Georgia's treatment of successive petitions is by no means peculiar to Georgia; we treat successive habeas petitions similarly. *See* Rule 9, Delayed or Successive Petitions, Rules Governing Section 2254 Cases, 28 fol. § 2254 (1982).

In summary, because petitioner has altogether failed to show either any "cause" for failing to raise in his direct appeal and his first state habeas petition the ineffective assistance and due process claims the district court and the majority have decided and, further, because petitioner failed to present one whit of evidence in the evidentiary hearing below that he was "prejudiced" [21] by the State's failure to appoint or to provide funds for an independent psychiatrist or by the State's failure to ensure that the court-appointed psychiatrist provided an adequate examination and testimony with respect to petitioner's sanity at the time of the offense, these claims should be denied.

### B.

The starting point of the majority's analysis of the merits of the first two claims reviewed is that an indigent defendant has a due process right to a psychiatric opinion as to his sanity at the time of the offense for which he stands charged. In this case, the trial judge attempted to accord petitioner that right by appointing a psychiatrist, Dr. Miguel A. Bosch, to examine petitioner to determine both his competency to stand trial and his sanity at the time of the offense. Dr. Bosch examined petitioner and well in advance of trial issued a report in which he stated that petitioner was competent to stand trial. No one takes issue with this opinion. Dr. Bosch also stated, in his report, that he could not determine whether petitioner was sane at the time of the offense. He had been unable to form an opinion on this issue, he said, because, during his examination of petitioner, petitioner told him that he was suffering from a total memory loss; he could not recall any of the events surrounding Tiffany Loury's homicide, even his act of throwing Tiffany off the Talmadge Memorial Bridge

---

**20.** The Seventh Circuit has similarly held in *Norris v. United States,* 687 F.2d 899 (7th Cir. 1982), although the Second Circuit has held that the "deliberate bypass," "knowing waiver" test remains the standard to be applied. *Pacelli v. United States,* 588 F.2d 360, 363–65 (2d Cir. 1978), *cert. denied,* 441 U.S. 908, 99 S.Ct. 2001, 60 L.Ed.2d 378 (1979).

**21.** *See infra* text at 549–551. In this case, the prejudice required under the *Wainwright v. Sykes* test is, I submit, the same as that required to prove a sixth amendment-due process claim concerning Dr. Bosch's psychiatric examination and opinion testimony.

into the Savannah River. The occasion of Dr. Bosch's examination appears to have been the only time petitioner suffered such a memory loss.

At petitioner's trial, the prosecutor, in the State's case in chief, put Dr. Bosch on the stand.[22] He stated once again that he had no opinion as to petitioner's sanity at the time of the offense. On cross-examination, petitioner's attorney handed him the transcript of a confession petitioner had made shortly after the murder and a suicide note he had given his jailer. Dr. Bosch had not seen either of these documents beforehand. Counsel then asked him if petitioner's utterances in these documents were psychiatrically significant, and he said they were. During the extended colloquy that followed, in which counsel tried to get Dr. Bosch to say that petitioner was insane at the time of the murder, Bosch continued to adhere to his prior statement, that he had no opinion as to petitioner's sanity at the time of the offense.

The majority faults the State for not providing Dr. Bosch, prior to trial, with the transcript of petitioner's confession and suicide note because, as it turned out, the contents of these documents were, as Bosch put it, "psychiatrically significant." To remedy this conduct, both here and in future cases, the majority fashions the following constitutional rule. Whenever the court appoints a psychiatrist to determine the defendant's sanity at the time of the offense, the State becomes obligated to provide the psychiatrist, on its own initiative, with any information that might prove to be psychiatrically significant on the sanity issue, and this obligation continues throughout the criminal prosecution.[23] To ensure the State's compliance with this rule, the majority holds that, if the State fails to provide the psychiatrist psychiatrically significant information as to the defendant's sanity at the time of the offense, defense counsel will be deemed ineffective as a matter of law and the defendant's conviction must be set aside.[24]

**22.** The record does not indicate why the prosecutor called Dr. Bosch as part of the State's case in chief; the lawyers' closing arguments to the jury were not made a part of the record in the district court and no explanation appears in the evidentiary hearing held before the district judge. I speculate that the prosecutor simply called Bosch in anticipation of petitioner's defense, to get the insanity issue out of the way early in the trial, although he ran a substantial risk, which indeed materialized, that petitioner's lawyer, having Bosch on cross-examination, could make some points through leading questions that he could not make on direct examination.

**23.** The majority makes this point unambiguously clear. It states that "[t]he judge's order of a psychiatric examination placed a duty upon the prosecution to provide [Dr. Bosch] and the defense with the transcript of [petitioner's] confession and ... suicide note" even though the defense had not requested such provision, citing *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), and *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). *Ante* at 532 n. 10. The prosecutor breached this duty, according to the majority, simply by withholding evidence from the psychiatrist which was "psychiatrically significant." *Ante* at 531 n. 8.

*Brady* and *Agurs*, I submit, are inapposite in this context. First, they deal with evidence "fa-

vorable to the defense"; I have considerable difficulty concluding that "psychiatrically significant" material is evidence favorable to the defense. Second, assuming the applicability of this precedent, I would not hold a prosecutor to have denied a defendant due process by failing to produce the defendant's own statements, especially where, as here, the defendant has made no request for his statements or even for evidence favorable to the defense.

The majority states that the prosecutor's failure to provide the defense and Dr. Bosch the materials in question "is indicative of bad faith on the part of the prosecution." *Ante* at 532 n. 10. Petitioner has never charged the prosecution with bad faith, and petitioner produced no evidence of bad faith. Prosecutorial bad faith is, simply, not an issue in this case.

**24.** The majority's rule would seem to apply in *all* cases in which the defendant's guilt turns on his mental status at the time of the offense. If the State withholds "psychiatrically significant" evidence from a psychiatrist hired to determine the defendant's mental capacity to commit the crime, what difference should it make whether the psychiatrist is court appointed, hired with State funds, or privately employed by the defendant; the question is, under the majority's test, whether the defendant's trial was unfair in a due process sense because, in the federal habeas court's opinion, the psychiatrist's examination and resulting opinion were "inadequate."

The district court, and the majority, have fashioned this rule and remedy out of their concern that the defendant receive a fair trial. In this case, they have concluded that petitioner's trial was rendered unfair because Dr. Bosch did not have the withheld information sufficiently in advance of testifying to enable him to give it the sort of deliberate consideration the majority thinks was necessary. They have drawn this conclusion purely from *their own lay assessment* of what was, and is, vital to the rendition of an expert psychiatric opinion of the specie Dr. Bosch was asked to give. I say this because there is nothing whatever in the record indicating that Bosch would have testified any differently than he did had the State made the information in question available to him at an earlier time.[25]

Dr. Bosch's opinion was that he could not say with the requisite certainty (the law requires for expert psychiatric opinion testimony to be probative) whether the defendant was sane or insane at the time of the offense. Contrary to what I perceive to be the majority's view, this constituted an opinion on the issue. It is not unusual for a psychiatrist, or any other expert, to say that he cannot form an opinion about an event he did not witness or experience. The majority observes that "Dr. Bosch was under a court order to express an opinion as to Blake's sanity at the time of the offense." *Ante* at 532. That may be, but a court cannot *order* an expert witness to give an opinion that he simply cannot give without doing violence to his professional judgment and integrity. It requires no citation of authority to say that competent, well-informed psychiatrists are sometimes unable to say whether a defendant was insane when he committed his crime.

Petitioner has shown no prejudice of any kind resulting from Dr. Bosch's examination and opinion testimony. He has never presented any testimony, or even a proffer, from Dr. Bosch—to the Georgia courts or to us—to the effect that he was insane at the time of the offense. Nor has he presented the testimony, or proffer, of any other psychiatrist, psychologist, or even a lay person, that he was insane. Surely petitioner could have made such a presentation.

A psychiatric opinion as to petitioner's mental or emotional state at the time of the offense, whether given by Dr. Bosch or anyone else, would have to be based on a hypothetical question, since the witness would have no personal knowledge of the criminal episode and thus could not testify about it absent an assumed set of facts. Petitioner was, and is, the only living witness to the murder of Tiffany Loury. Petitioner, alone, was, and is, in control of the facts of the crime. Even today, Dr. Bosch presumably could respond to a hypothetical question as to petitioner's sanity; Bosch could add whatever facts petitioner cared to have him assume, including the statements contained in his confession and suicide note, to the findings he made when he examined petitioner and attempt to formulate an opinion as to whether petitioner was sane or insane when he committed the offense. Thus, there is no need in this case conclusively to presume prejudice, as the district court and majority have done, either on the ground that the cost of establishing prejudice, or a lack thereof, at this date is too great or it is incapable of demonstration. There are other reasons, however, why we should require the petitioner to show prejudice in a case of this sort. A brief review of the events that took place between the murder, on November 15, 1976, and the trial, which began on February 13, 1977, makes this clear.

The murder occurred at the end of an evening of bar hopping during which petitioner and the victim's mother had been quarreling. According to the evidence ad-

---

**25.** The majority has acknowledged this point: "We, of course, do not know whether the psychiatrist, if he had these statements [i.e., the withheld information] before him and an opportunity further to question the accused, would have found them accurately to state [petitioner's] belief and, if so, whether he would have determined that [petitioner] was insane at the time of the act." *Ante* at 530.

duced at trial, petitioner kidnapped and killed Tiffany Loury either to get even with her mother or to save Tiffany from her parents, who, petitioner testified, were unfit to raise her. The first reason was quite plausible, for petitioner had previously threatened to kill his two-year-old son, in front of his seven months pregnant wife, the mother of the child, because she had spurned him. He did not carry out this threat; instead, he stabbed his wife.

The record does not inform us as to when the court appointed attorney Reginald Haupt to defend petitioner, but I assume that it was well before December 3, 1976, when Dr. Bosch examined petitioner at the Central State Hospital at Milledgeville, Georgia, pursuant to the trial court's order. The court apparently entered the order at Haupt's request, although we do not know whether the court took this action because Haupt filed a special plea of insanity[26] or because he informally requested the examination. The record is also silent as to when Haupt learned that his client had confessed to the murder.

What we do know is that Dr. Bosch, following his psychiatric examination, issued a report containing the opinions I have mentioned and a statement that petitioner declined to tell him anything about the murder; petitioner told Bosch that he could not recall the event. It is clear that attorney Haupt received a copy of that report considerably in advance of trial, but we do not know what communication he may have had with Dr. Bosch thereafter.

Though the record is silent on some of these matters, one thing is clear to me; that is, by the time the trial began Haupt was well prepared to try the guilt phase of the case and to present petitioner's insanity defense. Haupt's opening statement, his cross-examination of the State's case—especially Dr. Bosch—and his direct examina-

tion of petitioner during his presentation of the defense's case indicate to me that Haupt had consulted with petitioner, had prepared to examine Dr. Bosch, and knew full well the limitations of his insanity defense.

The following facts, in particular, argue forcefully against the presumed prejudice the majority embraces. After Dr. Bosch testified on cross-examination (by Haupt) that he had not considered the transcript of petitioner's confession and his suicide note (because they had not been given to him) when diagnosing petitioner's mental condition at the time of the offense, Haupt did not request a continuance or even a brief recess to allow Bosch to ponder over the new information; instead, he proceeded with his questioning. Haupt obviously felt it in his client's best interest to proceed; had a continuance been granted to allow Dr. Bosch more time to reflect, Bosch may well have concluded that petitioner was sane at the time of the offense. By foreclosing this damaging scenario from occurring, counsel was able to get Bosch to say that he could not render an opinion with reasonable certainty and to concede that petitioner might have been insane if what he said in his confession was true.

It is also important to note that, when Dr. Bosch left the witness stand, the defense did not ask him to remain in the courtroom to hear the evidence[27] or to make himself available to testify as a defense witness. Mr. Haupt could have conferred with Dr. Bosch further and then, after petitioner took the stand and revealed the details of the murder, elicited Dr. Bosch's opinion as to petitioner's sanity at the time of the offense. Conceivably, petitioner's courtroom revelations could have formed the basis of a more complete hypothetical question to the psychiatrist than the one Haupt put to him earlier, in the

---

26. *See generally* Ga.Code §§ 27–1502 and 27–1504 (1976) (superseded by Ga.Code Ann. § 17–7–130 (1982)).

27. Frequently, trial judges waive the witness sequestration rule to allow an expert to observe the proceedings. Later, when the expert is called to testify, he can use any pertinent information he has observed in formulating his opinion testimony, thus perhaps rendering unnecessary the lengthy, convoluted, and typically argumentative, hypothetical questions lawyers would otherwise be forced to utilize.

State's case in chief. Counsel chose not to pursue this course, however. Once again, he apparently did not want to run the risk of possibly damaging opinion testimony.

We should not presume prejudice in a situation such as this because of the extent to which *the defendant* has control over the issue. First, as here, the defendant may choose not to tell the psychiatrist anything, especially about the crime.[28] Second, his lawyer can keep the psychiatrist in the dark about the facts of the crime and would have every incentive to do so once the psychiatrist has said that the defendant is competent to stand trial and was either sane or of questionable sanity at the time of the offense. For all we know, that occurred here. Third, the defense can ask for a continuance or a recess to give the psychiatrist time adequately to consider the newly disclosed "psychiatrically significant" evidence and to eliminate the fairness problem the majority perceives.

Another reason why prejudice should not be presumed is that the burden such a presumption would place on the State would be intolerable. The State has to marshal at its peril the "psychiatrically significant information" on the insanity issue. It must divine what is and is not pertinent, and it must do so until the trial is over.[29] To satisfy the State's burden, the prosecutor must have continuous access to the psychiatrist, and he must compare the psychiatrist's information with his to ensure that the psychiatrist has all the facts.

If the foregoing practical and policy considerations do not counsel the rejection of the majority's position, then I suggest that Supreme Court precedent does. *United States v. Cronic*, —— U.S. ——, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), and *Strickland v. Washington*, —— U.S. ——, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), decided the same day, reiterate the long standing rule that prejudice is an indispensable element of an ineffective assistance of counsel claim, except in those few situations where the State's conduct has operated to deny the defendant his right to counsel altogether or has undermined his lawyer's performance to such an extent "that the trial cannot be relied on as having produced a just result." *Washington*, 104 S.Ct. at 2064. We cannot presume that this occurred in petitioner's case; accordingly, were I to reach the merits of the claims under examination, I would reject them for want of prejudice.[30]

### C.

The district court concluded that Reginald Haupt denied petitioner effective assistance of counsel in the sentencing phase of the case. Haupt's performance, the court found, was woefully inadequate because he did not prepare in any way to present mitigating evidence in petitioner's behalf. He "was not functioning as the 'counsel' guaranteed [the petitioner] by the Sixth Amendment." *Washington*, 104

---

**28.** Indeed, under the fifth amendment privilege against compelled self-incrimination, a defendant has a constitutional right to refuse to submit to a psychiatric examination, unless he raises the issue of sanity and introduces supporting expert psychiatric testimony of his own. *Estelle v. Smith*, 451 U.S. 454, 465–66, 101 S.Ct. 1866, 1874, 68 L.Ed.2d 359 (1981). If a defendant were to invoke this privilege, the State, under the majority's rule, would be found to have denied the defendant due process of law and effective assistance of counsel if it was later found that the State had withheld any psychiatrically significant information from the examining psychiatrist.

**29.** This conclusion is implicit, if not explicit, in the majority's discussion of the prosecutor's

duty to provide the defense and defense psychiatrist with material that may have a bearing on the accused's state of mind. *Ante* at 532 n. 10. Arguably, the prosecutor's duty extends beyond the issue of the accused's sanity at the time of the offense to the issues of his competency to stand trial and the sentence to be imposed.

**30.** A final observation should be made about the sweep of the majority's new rule. The majority implies that its new rule is limited to those cases in which the defendant's sole defense is the defense of insanity. In practically every case in which the defendant pleads insanity, that is his only defense. The new rule therefore will apply in virtually every insanity defense case.

S.Ct. at 2064. This portion of the court's holding is on sound footing; Haupt admitted that he was unprepared for the sentencing phase.

Having reached this conclusion, the district court next determined whether a showing of prejudice was necessary. It is at this point that the court erred. The court observed that "a credible, if hardly overwhelming showing of prejudice" had been made out because mitigating evidence was available and was not presented. *Blake*, 513 F.Supp. at 780. It refused to engage in "nice distinctions" about the effect such mitigating evidence might have had, however, concluding that it was sufficient that "[c]ounsel's conduct was clearly not 'harmless beyond a reasonable doubt.'" *Id.* at 781. As the majority correctly observes, "[t]he district court determined that Haupt's error was prejudicial *per se.*" *Ante* at 533.

The fact that defense counsel failed to develop and present to the sentencer (the jury in this case) mitigating evidence does not create a presumption, much less a conclusive presumption, that the defendant was prejudiced. *Strickland v. Washington*, 104 S.Ct. at 2064. The majority agrees. *Ante* at 533–534. Rather, the defendant must demonstrate that there is a "reasonable probability that, but for counsel's unprofessional errors, the results of the proceedings would have been different." *Id.* 104 S.Ct. at 2068. A court cannot find such a "reasonable probability" without weighing the mitigating evidence against the aggravating evidence that supports the imposition of the death penalty. Because the district court failed to perform this essential task, I would remand this ineffective assistance claim for reconsideration under *Washington*'s test.[31]

31. The majority, on its own initiative, has weighed the aggravating and mitigating evidence in this case and concluded that the "probability that [petitioner] would have received a lesser sentence but for his counsel's error is sufficient to undermine our confidence in the outcome." *Ante* at 535. This, in my view,

constitutes appellate fact finding, a function the Supreme Court has cautioned us not to perform. *See Pullman-Standard v. Swint*, 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982).