

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-21-00178-CR

———————————————

TONY LYNN ROSE AKA TONY ROSE, Appellant

V.

THE STATE OF TEXAS

On Appeal from the 355th District Court
Hood County, Texas
Trial Court No. CR14328

Before Kerr, Birdwell, and Bassel, JJ.
Memorandum Opinion by Justice Birdwell

## MEMORANDUM OPINION

## I. Introduction

Late one night in August 2018, Appellant Tony Lynn Rose aka Tony Rose used methamphetamine and then called for an ambulance after the ensuing drug-induced anxiety attack made him think that he "was about to die." The hospital gave him Ativan[1] at 1:52 a.m. to calm him and then, noting that he was "awake, alert and oriented," discharged him at 2:36 a.m. Rose "took off walking" at 2:51 a.m. At 4:03 a.m., a sheriff's deputy returned him to the emergency room. When Rose refused to be checked back into the hospital, the deputy took him to the Hood County Jail on a public intoxication charge.

At the jail, Rose became disruptive. Jail staff decided to move him from the common holding cell to an individual padded cell for his protection and the protection of other inmates in the common holding cell. During the transfer, Rose kicked Officer Christopher Head's right hip or upper right leg hard enough to knock off the officer's radio clip, but he stopped struggling immediately when confronted with a pepper ball gun. The trial court admitted a jail recording of the exchange and allowed it to be published to the jury. Officer Head testified that Rose's kick had been intentional, and Rose testified that he did not remember fighting with the

---

[1]Ativan is an anti-anxiety drug. *Boyer v. State*, No. 02-09-00092-CR, 2010 WL 3432843, at *8 (Tex. App.—Fort Worth Aug. 31, 2010, pet. ref'd) (per curiam) (mem. op., not designated for publication).

officers, that he would never intentionally hurt an officer, and that he did not see on the video where he had actually kicked the officer.

The jury found Rose guilty of assault on a public servant, a third-degree felony. *See* Tex. Penal Code Ann. § 22.01(b)(1). After Rose pleaded true to an enhancement paragraph alleging a prior felony theft conviction, the jury assessed his punishment at sixteen years' confinement, and the trial court entered judgment accordingly. *See id.* § 12.33 (setting out second-degree-felony punishment range of 2 to 20 years and up to a $10,000 fine), § 12.42(a) (enhanced punishment). Rose then filed a motion for new trial, arguing that he had received ineffective assistance of counsel. After a hearing, the trial court denied the motion, and this appeal followed.

In three issues, Rose complains that the evidence is insufficient[2] to show that he intentionally or knowingly assaulted a public servant and that he received ineffective assistance of counsel during punishment from his retained attorney.[3] We affirm the trial court's judgment because the record is insufficient to support his ineffective-assistance complaint but sufficient to support his conviction.

---

[2]Rose divides his complaint between legal and factual sufficiency, but that is no longer the standard. *See Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (overruling *Clewis v. State*, 922 S.W.2d 126 (Tex. Crim. App. 1996)).

[3]A criminal defendant is entitled to effective assistance from retained counsel. *Cuyler v. Sullivan*, 446 U.S. 335, 344–45, 100 S. Ct. 1708, 1716 (1980); *Aldrich v. State*, 296 S.W.3d 225, 231–32 (Tex. App.—Fort Worth 2009, pet. ref'd) (op. on reh'g).

## II. Sufficiency

In our evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). This standard gives full play to the factfinder's responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Harrell v. State*, 620 S.W.3d 910, 914 (Tex. Crim. App. 2021). The factfinder alone judges the evidence's weight and credibility. *See* Tex. Code Crim. Proc. Ann. art. 38.04; *Martin v. State*, 635 S.W.3d 672, 679 (Tex. Crim. App. 2021). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution. *Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018).

As authorized by the elements of the offense, *see* Tex. Penal Code Ann. § 22.01(b)(1), and by the indictment, *see Hammack v. State*, 622 S.W.3d 910, 914 (Tex. Crim. App. 2021), the jury could find Rose guilty if it found beyond a reasonable doubt that Rose had intentionally or knowingly caused bodily injury to Christopher Head, a detention officer for the Hood County Sheriff's Office, by kicking him on or about the upper leg while Head was lawfully discharging an official duty and while Rose knew that Head was a public servant. A person acts intentionally, or with intent,

with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result. Tex. Penal Code Ann. § 6.03(a). He acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist, and he acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result. *Id.* § 6.03(b).

## A. Guilt–innocence evidence

Officer Head identified Rose both from his in-person appearance at trial and from Rose's August 5, 2018 booking photo, which was admitted into evidence and published to the jury. In the photo, Rose is shirtless, which is how he arrived at the jail.

Officer Head testified that after Rose was booked and placed into a holding cell, he became "upset" and started hitting the holding cell window. Sergeant Aaron Bruner, Officer Head's supervisor, testified that Rose had been very agitated when he arrived at the jail, that Rose had been kicking the holding cell door and screaming, and that Rose had tried three or four times "to escalate things in the cell and fight with other individuals" by cursing at them. Sergeant Bruner decided to move Rose to a cell with padded foam walls to avoid disturbing the other inmates in the holding cell and to keep Rose from harming himself or others. He asked Officers Head and Collins to assist him.

5

As they moved Rose, Officer Head noticed that Rose was wearing drawstring shorts. Because inmates are not allowed to have any string in the padded cell—"because they could hang themselves"—he began to remove the drawstring. At that point, Rose "reached his leg up and kicked [Officer Head] in [his] right hip, knocking [his] radio clip off [his] radio." Officer Head testified that it hurt when Rose kicked him, that Rose had kicked him hard enough to break the radio clip, and that Rose had meant to kick him based on "[t]he way his leg motioned up forward and then swung to the right on [Officer Head]." After Rose kicked Officer Head, Sergeant Bruner drew his pepper ball gun, which caused Rose to immediately stop resisting.

Officer Head testified that Rose's movement was not part of a struggle to get away and that Rose knew that he was a jailer. The trial court admitted into evidence and allowed the State to publish to the jury a 2018 photo of Officer Head in his jailer uniform.

The trial court admitted into evidence twenty-eight seconds of video of the incident and allowed it to be published to the jury. When the video begins, Officer Head, wearing a jailer uniform, is on Rose's left; Officer Collins is on Rose's right; and Rose's hands are handcuffed behind his back. Sergeant Bruner approaches as Officer Head bends at the waist to pull Rose's drawstring, and then Rose starts to swerve away. Officer Collins moves with Rose, continuing to hold onto Rose's arms; the interposing of his body prevents the recording from showing the kick. At 00:15, there is no radio clip on the floor, and Rose is facing Officer Head, with Officer Collins

6

behind Rose, holding onto Rose's handcuffed arms. At 00:16, the radio clip has landed on the floor, as Officer Collins, still holding Rose's arms, swings him around and then lets him go when Sergeant Bruner draws his pepper ball gun, at which point Rose stops struggling.

The video had no audio track, but Officer Head testified that Rose had cursed at them during the incident. Sergeant Bruner's testimony matched Officer Head's, including that Rose had tried to cause harm when he kicked Officer Head.

Rose began his testimony by recounting his prior criminal convictions: a 2012 burglary-of-a-building conviction; a 2012 class A misdemeanor assault–bodily-injury-of-a-family-member conviction; a 2006 third-degree-felony theft conviction for which he received probation that was subsequently revoked; and a misdemeanor conviction for falsifying a drug test. He testified that he never had any problems with officers, with following rules, or with fighting during his previous sojourns in state and county jails. He then offered, and the trial court admitted into evidence, his hospital records from that night.

Rose claimed at trial that his girlfriend had brought the methamphetamine, but he told hospital personnel that he had found it laying around the house and that he had been sober for several months.[4] The next thing he remembered after using the drugs was going to the hospital. He lived around a mile from the hospital, so he

---

[4]Rose's hospital records reflect that he told medical personnel that he had smoked and swallowed the methamphetamine and had placed it "rectally."

started walking home after the hospital discharged him. When asked if he remembered being arrested on his way home, Rose said that he recalled being put in a vehicle and asked if he wanted to go back to the hospital or to go to jail. When he told the officer that he did not want to go back to the hospital, he was taken to the jail.

Rose stated that he was initially placed in a cell with other inmates but that he had tried "to get a separate room so [he could] be emotional" away from other men. He had been upset that he would lose full custody of his son and did not know where his son was at that time.[5] He also testified that he did not remember being in the holding cell and remembered nothing after the Ativan dose at the hospital. He testified as follows during cross-examination:

> Q. All right. You're telling this jury that you don't remember anything that happened when they took you out of that first jail cell?
>
> A. I do not -- I don't remember anything like that at all. I'm not violent like that at all. I was more emotional and crying, not violent in the video and the next day when I was talking to them about the situation.
>
> Q. Well, how can you remember if you were emotional if you can't remember anything else?
>
> A. I mean, going from losing a child, you know, and everything else, I mean, everybody would be emotional about that in my eyes.

---

[5]The hospital records note that at 4:10 a.m., a Child Protective Services caseworker called the hospital to ask for information about Rose. The hospital staff told the caseworker that Rose had been discharged and to contact the sheriff's office.

Q.  You remember being emotional but you don't remember anything else?

A.  I remember being emotional the next day when they were telling me everything that -- what happened, what supposedly happened.

Q.  You just told us you were emotional in the jail cell.

A.  I would have to be emotional.  Like, I mean --

Q.  Sir, Officer Bruner testified that you were very agitated in that first jail cell.

A.  I mean, I don't really remember like inside the jail cell.  I seen the video.

Q.  He testified that you were very loud in there?

A.  I probably said some things I shouldn't have said.

Q.  Like what?

A.  I wouldn't remember.

Q.  He testified you were trying to fight in there?

A.  No, sir.

Q.  Trying to rile people up?

A.  Definitely not, sir.

Q.  Okay. So Officer Bruner is lying?

A.  I wouldn't say that I was trying to rile anybody up.  I was trying to get to another cell by myself because I was going through a -- the whole drug thing.  Like I said, I just wanted to be by myself and not be around anybody at all.

Q.  Well, he testified you were trying to rile people up.

9

A. I wasn't trying to fight or anything like that.

Q. So is he lying?

A. I'm not saying anything -- like the whole situation is you're saying that I did something I didn't do, so --

Q. Is Officer Bruner lying?

A. About -- can you repeat the question, sir?

Q. He testified you were trying to get people riled up, that you were loud and that you were agitated.

A. I wasn't trying to get people riled up. I was trying to move cells by myself.

## B. Analysis

Rose argues that the evidence is insufficient to support his conviction in that the jail video may show his resistance and lack of cooperation but not that he intentionally or knowingly kicked Officer Head. The jury disagreed about the evidence's sufficiency: after reviewing the video, hearing the testimony—from which they had to determine if they believed the officers or Rose—and viewing the other evidence, the jury deliberated for only twelve minutes before finding Rose guilty. Because we may not re-evaluate the evidence's weight and credibility and substitute our judgment for the jury's, *see Queeman*, 520 S.W.3d at 622, and because viewed in the light most favorable to the verdict, the jury could have found beyond a reasonable doubt that Rose intentionally or knowingly kicked Officer Head and that he knew the

10

officer was a public servant, *see Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789, we overrule Rose's second and third issues.[6]

### III. Ineffective Assistance

In his first issue, Rose complains that his counsel was ineffective during the trial's punishment phase.

The Sixth Amendment guarantees a criminal defendant the effective assistance of counsel. *Ex parte Scott*, 541 S.W.3d 104, 114 (Tex. Crim. App. 2017); *see* U.S. Const. amend. VI. To establish ineffective assistance, an appellant must prove by a preponderance of the evidence that his counsel's representation was deficient and that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); *Nava v. State*, 415 S.W.3d 289, 307 (Tex. Crim. App. 2013); *Hernandez v. State*, 988 S.W.2d 770, 770 (Tex. Crim. App. 1999). The record must affirmatively demonstrate that the claim has merit. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999).

In evaluating counsel's effectiveness under the deficient-performance prong, we review the totality of the representation and the particular circumstances of the case to determine whether counsel provided reasonable assistance under all the circumstances and prevailing professional norms at the time of the alleged error. *See Strickland*, 466 U.S. at 688–89, 104 S. Ct. at 2065; *Nava*, 415 S.W.3d at 307; *Thompson*, 9

---

[6]We reordered Rose's issues to address those providing the greatest potential relief first. *See Benavidez v. State*, 323 S.W.3d 179, 182 (Tex. Crim. App. 2010).

S.W.3d at 813–14. Our review of counsel's representation is highly deferential, and we indulge a strong presumption that counsel's conduct was not deficient. *Nava*, 415 S.W.3d at 307–08.

*Strickland*'s prejudice prong requires a showing that counsel's errors were so serious that they deprived the defendant of a fair trial—that is, a trial with a reliable result. *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064. In other words, an appellant must show a reasonable probability that the proceeding would have turned out differently without the deficient performance. *Id.* at 694, 104 S. Ct. at 2068; *Nava*, 415 S.W.3d at 308. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068; *Nava*, 415 S.W.3d at 308. We must ultimately focus on examining the fundamental fairness of the proceeding in which the result is being challenged. *Strickland*, 466 U.S. at 696, 104 S. Ct. at 2069. "[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id.*, 104 S. Ct. at 2069.

An appellate court may not infer ineffective assistance simply from an unclear record or a record that does not show why counsel failed to do something. *Menefield v. State*, 363 S.W.3d 591, 593 (Tex. Crim. App. 2012); *Mata v. State*, 226 S.W.3d 425, 432 (Tex. Crim. App. 2007). Trial counsel "should ordinarily be afforded an opportunity to explain his actions before being denounced as ineffective." *Menefield*, 363 S.W.3d at 593.

## A.  Punishment trial

The prosecutor's opening statement during the October 21, 2021 punishment phase centered on determining the just and appropriate punishment based on additional evidence about Rose's background—including more about his criminal history—and "about the kind of person he is."  The prosecutor stated, "You're going to take all of that into account and decide what the appropriate, just punishment is in this case."  Rose's counsel declined to make an opening statement.

The State recalled Sergeant Bruner as the sole punishment witness.  Through Sergeant Bruner, the State offered, and the trial court admitted into evidence another class-A misdemeanor assault–bodily injury conviction that Rose committed on the same day (November 26, 2011) as the one entered during the guilt–innocence phase.  The second assault involved a woman who was not a member of Rose's family or household.  Rose had pleaded guilty to both assaults—specifically, to having intentionally or knowingly caused bodily injury to the household member by grabbing her arms or by throwing her on the floor and to having intentionally or knowingly caused bodily injury to the other woman by striking her with his hand.  His trial counsel asked no questions during punishment.

During his punishment-phase closing statement, trial counsel asked the jury to look at Rose's previous punishments:  seventeen days for falsifying drug test results; a concurrent fifty-three days for the assaults; eight months for burglary; and three years for theft.  He reminded the jury of the two-to-twenty-year punishment range and

asked, in light of Rose's prior sentences, for a mid-range sentence, stating, "[I]t was three last time. It ought to be more than double that this time. I mean, let's be realistic. . . . What's wrong with somewhere in the middle?" He reminded the jury that there was no serious injury to Officer Head and that Rose was not a "hardened criminal." He also asked the jury not to impose a fine, stating, "I've been doing this 36 years and nobody knows where the money goes or if they ever get it because it disappears somewhere into the State."

In rebuttal, the prosecutor reminded the jury that Rose had abused methamphetamine that night and that his prior criminal-justice experiences had not stopped him from breaking the law. The prosecutor asked the jury to assess a twenty-year sentence and no fine. During deliberations, the jury issued a note asking, "Is there any drug rehab given in prison? Can we request it?" The jury deliberated from 1:20 p.m. to 2:05 p.m. before assessing a sixteen-year sentence and no fine.

## B. New-trial hearing

Rose, his trial counsel, his father, and his sister testified during the new-trial hearing, which was held two months after the punishment trial.

Rose testified that in the weeks before trial, he did not have a conversation with his attorney about witnesses to call during the punishment phase and why he might want to call them. He stated that his counsel did not ask him about witnesses until he "was sitting in that chair right there the day of trial." He stated that he had wanted to testify during the punishment phase but that his attorney had not called him as a

14

witness and that he would have called as witnesses his son, his father, and his sister, with whom he claimed good relationships, but that no one told him to call them. Rose said that if he had been allowed to talk to the jury during punishment, he would have told them about himself and his work history, his relationship with his son, and his mental health history.

Rose testified that, growing up, he had been successful in sports and motocross and had been scouted for a college basketball team. He stated that he attended Le Cordon Bleu for college. As to his work history, Rose testified that he would have told the jury that he was a hard worker and had worked in welding and as a union iron worker traveling "all around America." He had worked on the Tesla facility in Reno, a Frost Bank in San Antonio, and a Lowe's in Maui. He had also worked on custom homes and remodeling boat docks. He did not identify who his employer had been at the time of the assault, and his hospital records stated that he was self-employed. In his trial testimony, he said that he had a full-time job, but in neither his trial nor new-trial testimony did he identify an employer who would or could have testified on his behalf.

Regarding his son, Rose testified that he would have told the jury about how his son was his best friend, that they played sports, and that they had a special relationship. He did not identify how old the child was or describe how the relationship was special, other than to note that the "best day of [his] whole life" was

15

his son's recent baptism. He did not mention any CPS history, although his hospital records reflect that CPS had called to find him while he was in the county jail.

Rose testified that if he had been asked about his mental health history, he would have told the jury that he was "a very compassionate person," that he was "all about family," and that he had been walking home from the hospital to check on his son. He did not bring any mental health records or an opinion from a mental health expert to the new-trial hearing.

Rose's trial counsel testified that he did not recall a specific conversation with Rose about mitigation witnesses but stated, "I always look for some help in these kind of cases." He stated that the best mitigation witness would be a defendant's employer, followed by his preacher. He did not testify about whether he contacted Rose's employer, but he testified as follows regarding Rose's preacher, father, and sister:

Q. Did you know he had a preacher?

A. Well, he wasn't coming.

Q. Did you talk to him?

A. No.

Q. Well, did you know who he was?

A. No. I don't remember.

Q. And if you knew who he was, would -- would you have had him there?

A. If -- if he would have helped, yes. You're always looking for help in these kind of things.

Q. Well, what about his dad?

A. His dad -- I had a lot of conversations with his dad.

Q. Would he be a good witness?

A. I don't know. Your family always sticks up for you, and juries are smarter than that. They know that the family is always going to -- you really need somebody outside the family for character witnesses because, I mean, juries have kids. They know they excuse their own kids and families do too.

Q. Did you ever talk to his sister?

A. I don't know. I think so, but I don't remember.

Q. Do you know what she does for a living?

A. No.

Q. Do you know she's a teacher?

A. No.

Q. So is it your strategy to not call family as a general rule?

A. No. You always look -- look for people, anybody that will help, but if their family is decent-looking and they act right, yeah, you call them.

Q. And he says that you didn't discuss all of this with him prior to.

A. I -- I know that I did. I always do.

Trial counsel claimed that he had told Rose that he could testify during punishment but did not recommend it because "[Rose] was wanting to tell the jury

17

how wrong they were, and that usually backfires big time." The trial court admitted Rose's page of trial notes. Among Rose's musings were two notes, both of which were circled. The first says, "Are you gonna talk again and say he had no injuries?" and the other says, "Didn't have a mark on him."[7]

Trial counsel addressed Rose's mental health, stating, "He's able to work. He knows what day it is. He makes decisions," and he said Rose had been "way too high functioning" for a mental health dismissal of his case. Trial counsel stated that a year later, he obtained medical records showing "basically the same thing" as the hospital records from the day of the incident, stating "depression, substance abuse. And a year later really didn't help us."

Trial counsel agreed that he could have, but did not, subpoena the jailers to address Rose's mental health and said that he did not subpoena them because "[t]hey were not going to help us." He had read their reports and because the case involved an assault against a fellow officer, "[t]hey're going to stick up for their decision," although he agreed that was a guess on his part. He agreed that Rose had done a good job testifying during guilt–innocence but that as to punishment, "[t]he problem is the facts were still against us." When asked, "[A]s far as mitigating evidence, . . . isn't that the time to show . . . who he is as a person," trial counsel replied, "I don't know."

---

[7]Trial counsel explained, "[I]t's not the offense to leave a mark. The offense is to hit the officer." Rose testified that he would have told the jury that the officer did not have a mark or bruises on him.

On cross-examination, trial counsel testified that he had been an attorney for over forty years, most of it practicing criminal defense in Hood County, and he agreed that he had a pretty good understanding of what Hood County juries respond to. He stated that his defense strategy had been to show that Rose had not intended to commit the offense; he was not asked and did not testify about any other strategy with regard to punishment.[8]

Rose's father testified that he had talked with Rose's trial counsel several times but that their conversations had been about money and "[n]ot whatsoever" about his taking the stand as a witness during Rose's trial or about Rose's work history or religion. Rose's father stated that he would have told the jury that Rose was not a fighter but rather had a soft heart; he stated, "I don't have no idea what happened that night here or whatever," but for the other thirty-five years of his life, Rose had been "a great guy" and never a "police hater." He stated, "I could have this whole court full of people that [Rose] knows and some of the policem[en] that [Rose] has associated with that we know. I could -- that would have happened." He stated, "[I]f you go to West Bay Marina and ask about [Rose], there's about 400 people that lives there and every one of them loves him." However, other than Mose Trumble, whom he named as a policeman in Athens, Texas, Rose's father did not specifically identify

---

[8]While voluntary intoxication is not a defense to a crime's commission and does not negate intent or knowledge, *see* Tex. Penal Code Ann. § 8.04(a), evidence of temporary insanity caused by intoxication may be introduced by the actor in mitigation of the penalty attached to the offense for which he is being tried, *id.* § 8.04(b).

anyone, and he did not state what Trumble or anyone else would have testified about or that they would have been available to testify.

Rose's sister testified that she was a school teacher, that she had spoken with Rose's trial counsel, and that she could have and would have testified at trial in Rose's favor and had never told counsel that she did not want to testify. She stated that her testimony would have been

> [t]hat [Rose]'s not a violent person. He's very honest. He's caring. Never met a stranger, kind person, good dad, sees his son all the time, every other weekend if it was his weekend, goes to all the sports, goes to church. And he's not violent. And I don't know what happened that night. I really don't know. I wasn't there. I can't say. But he -- he's not that kind of person.

The trial court denied the motion at the hearing's conclusion.

## C. Analysis

An appellant claiming ineffective assistance of counsel at trial must identify counsel's allegedly erroneous acts and omissions. *Strickland*, 466 U.S. at 690, 104 S. Ct. at 2066; *Cooper v. State*, 333 S.W.3d 859, 867 (Tex. App.—Fort Worth 2010, pet. ref'd). The appellate court then determines whether, in light of all the circumstances, these identified acts or omissions were outside the wide range of what constitutes competent assistance. *Strickland*, 466 U.S. at 690, 104 S. Ct. at 2066; *Cooper*, 333 S.W.3d at 867. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690, 104 S. Ct. at 2066.

### 1. Voir dire

Rose initially complains that his counsel did not conduct voir dire on the following topics: the right to testify or not and how the jurors might feel about a defendant's decision to testify or not; the presumption of innocence; the burden and standard of proof; bias; state of mind; the full range of punishment; and any prospective juror's personal or family experience with drug use, drug abuse, or Ativan, or their backgrounds in medicine, counseling, law enforcement, or mental health.

The record reflects that the prosecutor asked the venire if they or their family members had ever been arrested or had ever been a crime victim and asked for their thoughts about fairness; waiting to decide until they had heard all of the evidence; the full range of punishment; the Fifth Amendment privilege against self-incrimination; the burden of proof; and the presumption of innocence.

These topics having already been covered, Rose's trial counsel reminded the potential jurors that there was a "double mental state" in this offense—"You have to knowingly assault somebody that's a public servant and you have to know that they're a public servant"—and that they would have to listen to all of the evidence before reaching a verdict. He then addressed their philosophies about punishment through a question about whether any had ever changed religions. During the new-trial hearing, Rose's trial counsel was not asked any questions about voir dire to explain his strategy, and Rose does not explain which jurors were objectionable, why further questioning might have been in order, and whether or how any of them would have been

21

challengeable for cause. *See McFarland v. State*, 928 S.W.2d 482, 503–05 (Tex. Crim. App. 1996) (concluding no ineffective assistance during voir dire), *abrogated on other grounds by Mosley v. State*, 983 S.W.2d 249 (Tex. Crim. App. 1998). Because we may not infer ineffective assistance from a record that does not show why counsel failed to do something, *see Menefield*, 363 S.W.3d at 593, we overrule this portion of Rose's first issue.

### 2. Punishment phase

Regarding the punishment phase of trial, Rose complains that his trial counsel was unaware of and did not present any mitigating evidence, did not call any witnesses, did not make an opening statement, and did not make any objections.

### a. Opening statement

As with voir dire, Rose's trial counsel was not asked at the new-trial hearing about his reason for declining to make a punishment-phase opening statement. Further, a defense opening statement is not required. *See* Tex. Code Crim. Proc. Ann. art. 36.01(b) ("The defendant's counsel *may* make the opening statement for the defendant immediately after the attorney representing the State makes the opening statement for the State." (emphasis added)). And choosing not to make an opening statement is an "inherently tactical" decision that is made based on how a trial is unfolding, the trial strategy employed, the defense attorney's experience and judgment, and other factors. *Taylor v. State*, 947 S.W.2d 698, 704 (Tex. App.—Fort Worth 1997, pet. ref'd) (per curiam). Accordingly, because our review of counsel's

22

representation is highly deferential and indulges a strong presumption that his conduct was not deficient, *see Nava*, 415 S.W.3d at 307–08, we cannot say that counsel's declining to make a punishment-phase opening statement rendered his representation ineffective, and we overrule this portion of Rose's first issue.

### b. Objections

Rose is correct that his trial counsel made no objections during either guilt–innocence or punishment. However, during the new-trial hearing, the only question to Rose's counsel about an objection was as follows:

> Q. Well, [Rose] says the only objection you made at the trial was objecting to him speaking. You asked him to be quiet. Is that right?
>
> A. That doesn't sound right.
>
> Q. I mean, if that's what happened and if that's what the record shows, you would -- would there be any reason why you would tell him to be quiet?
>
> A. No.
>
> Q. Okay. Would there be any good strategy for that?
>
> A. I don't know the context you're talking about.
>
> Q. Okay.
>
> A. I don't remember that. I can't imagine calling a witness and telling him not to testify.
>
> Q. Okay.
>
> A. Why would -- why would you call a witness if you didn't want them to speak?

Rose's trial counsel had given Rose a piece of paper to write notes on because he could not allow him to talk during another witness's testimony. He stated, "I might have to tell him to be quiet and point to the notes so he can write down things." During Rose's cross-examination in the trial's guilt–innocence phase, his trial counsel asked the trial court to remind Rose not to answer unless there was a question and to wait to answer until the prosecutor finished the question. Later in Rose's cross-examination, he also asked the trial court to remind Rose to slow his rate of speech. The record does not reflect an objection by his trial counsel during Rose's testimony.

A failure to object will not support a claim of ineffective assistance unless the trial court would have erred by overruling the objection, *Prine v. State*, 537 S.W.3d 113, 117–18 (Tex. Crim. App. 2017),[9] and when the record is silent as to why counsel

---

[9]State's Exhibits 1–6 and 8 are photographs, the video, and documents showing Rose's prior convictions, and Rose does not explain how any of these materials were objectionable. Rose's counsel did not object to the State's request to re-open and read the enhancement paragraph to the jury, but documents supporting the conviction listed in the enhancement had already been admitted into evidence by that time.

In his fact statement, *cf.* Tex. R. App. P. 38.1(g) (stating that a fact statement should be "without argument"), Rose appears to complain that his trial counsel should have objected when the prosecutor asked Officer Head if Rose meant to kick him and when he asked Officer Head if Rose knew that he was a jailer—questions pertaining to Rose's intent or knowledge. But Officer Head elaborated on his affirmative responses to both questions, stating that Rose had intended to kick him based on "[t]he way his leg motioned up forward then swung to the right on [him]," and that he had been wearing his jailer uniform at the time, which the video showed. Circumstantial evidence—of intent or other elements—is as probative as direct

24

failed to object, it is insufficient to overcome the presumption that his actions were part of a strategic plan, *Tong v. State*, 25 S.W.3d 707, 714 (Tex. Crim. App. 2000). On this record, trial counsel's failure to object cannot support Rose's ineffective-assistance claim, and we overrule this portion of his first issue.

### c. Mitigation

Rose argues that it is ineffective to discount family witnesses because "juries are smarter than that," and that his counsel was ineffective because he unaware of and did not present any mitigating evidence and did not call any witnesses. Rose also argues that it is ineffective to wait until the day of trial to ask a client about character witnesses.

Counsel has a duty to either reasonably investigate or reasonably decide that a particular investigation is unnecessary. *Wiggins v. Smith*, 539 U.S. 510, 521–23, 123 S. Ct. 2527, 2535–36 (2003) (noting that the court should "focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of [the appellant's] background *was itself reasonable*");[10] *Strickland*, 466 U.S. at 690–91, 104

---

evidence in establishing guilt. *Carter v. State*, 620 S.W.3d 147, 149 (Tex. Crim. App. 2021), *cert. denied*, 142 S. Ct. 859 (2022); *Laster v. State*, 275 S.W.3d 512, 519–20 (Tex. Crim. App. 2009).

[10]In *Wiggins*, a death-penalty case, the Supreme Court concluded that defense counsel's investigation did not meet *Strickland*'s performance standards because the decision to end the investigation without a social history report was neither consistent with professional standards nor reasonable in light of the evidence in the defendant's social services records. 539 U.S. at 533–34, 123 S. Ct. at 2541–42. It further concluded that the defendant had received ineffective assistance because his

S. Ct. at 2066. In assessing the reasonableness of an undertaken investigation, a court must consider not only the quantum of already-known evidence but also whether that evidence would lead a reasonable attorney to investigate further. *Ex parte Garza*, 620 S.W.3d 801, 824 (Tex. Crim. App. 2021). Counsel's failure to call witnesses at the guilt–innocence or punishment phases of trial is irrelevant absent a showing that the purported witnesses were available and that their testimony would have benefitted the appellant. *King v. State*, 649 S.W.2d 42, 44 (Tex. Crim. App. 1983); *Gomez v. State*, 552 S.W.3d 422, 435 (Tex. App.—Fort Worth 2018, no pet.).

Further, there is no prejudice when the new mitigating evidence presented in a habeas or new-trial posture "[]would barely have altered the sentencing profile presented[] to the decisionmaker." *Sears v. Upton*, 561 U.S. 945, 954–56, 130 S. Ct. 3259, 3266 (2010). Significant new mitigation evidence, on the other hand, might include heroic military service, *see id.* at 955–56, 130 S. Ct. at 3266–67; a history of chronic physical and sexual abuse of the defendant from a young age by a parent, *see Ex parte Gonzales*, 204 S.W.3d 391, 399 (Tex. Crim. App. 2006); or expert testimony about a defendant's mental health, *see Garza*, 620 S.W.3d at 815–16.

---

sentencing jury heard only one significant mitigating factor—that he had no prior convictions—and heard nothing about his excruciating life history, which had included abandonment and abuse by his mother and then physical and sexual abuse in foster care. *Id.* at 517, 537, 123 S. Ct. at 2533, 2543. "Had the jury been able to place petitioner's excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance." *Id.* at 537, 123 S. Ct. at 2543.

To support his ineffective-assistance argument, Rose refers us to *Milburn v. State*, 15 S.W.3d 267, 270 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd), *Humphrey v. State*, 501 S.W.3d 656, 663 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd), *Vela v. Estelle*, 708 F.2d 954, 964 (5th Cir. 1983), and *Blake v. Kemp*, 758 F.2d 523, 535 (11th Cir. 1985). However, only *Humphrey* resembles this case.

In *Milburn*, a felony cocaine-delivery case in which the appellant received a forty-year sentence (ten years longer than that requested by the State), the court found ineffective assistance when the new-trial record showed that the parties had stipulated to the testimony of twenty of the appellant's friends and relatives and defense counsel testified that he had neither investigated nor evaluated available punishment evidence. 15 S.W.3d at 268–71. In contrast, Rose's trial counsel testified that he always considered mitigation evidence, and despite Rose's father's testifying that he could have brought a "court full" of people and that 400 people at West Marina Bay loved Rose, he identified only one potential witness by name, did not disclose to what any of them would have testified, and did not state that any of them would have been available to testify. *Cf. King*, 649 S.W.2d at 44. Rose's father and sister would have testified that Rose was not violent—contrary to the assault offenses in the record to which Rose had pleaded guilty, the jail recording, and the offense for which the jury had just convicted him—and they would have been subject to cross-examination by the State about all of these topics.

27

In *Vela*, the defendant pleaded guilty to murder, was sentenced to 99 years' confinement, and after exhausting his state court (Texas) remedies, sought federal habeas corpus relief based on ineffective assistance. 708 F.2d at 956–57. The Fifth Circuit found prejudice primarily from the admission of evidence about the murder victim, noting,

> Faced with the task of assessing Vela's punishment, the jury was informed that the man he had killed was kind, inoffensive, a star athlete, an usher in his church, a member of its choir, a social worker with underprivileged children of all races, a college student holding down two jobs while he attended classes and played on the championship football team, and the father of a three-year-old child. The truth of these statements is, of course, not in issue; the point is that they are irrelevant to the severity of Vela's sentence[] and should not have been considered by the jury.
>
> . . . The State dropped a skunk into the jury box. Defense counsel made no serious effort to either identify it as a skunk, have it removed, or have the jury instructed to disregard its presence.

*Id.* at 966. Rose has identified no similar skunk in his case. *Cf. id.*

In *Blake*, another federal habeas murder case, the defendant's sanity was the case's only issue. 758 F.2d at 525–28. His counsel testified at the habeas hearing that he had made no preparations whatsoever for the trial's penalty phase because he believed that the defendant would be found not guilty by reason of insanity. *Id.* at 533. When he realized the jury would likely find his client guilty, he sought a continuance, which was denied, and he accordingly went into the sentencing phase with no idea of the availability of mitigating evidence that might persuade the jury not to impose a death sentence. *Id.* The defendant met his prejudice burden when he

28

demonstrated that no favorable evidence was sought and that some was in fact available. *Id.* at 534. His counsel had interviewed the defendant's father on more than one occasion and he had met with both of the defendant's parents at his office once before trial, but this was the extent of his investigation into character evidence. *Id.* The court concluded,

> This was not simply the result of a tactical decision not to utilize mitigation witnesses once counsel was aware of the overall character of their testimony. Instead, it was the result of a complete failure—albeit prompted by a good faith expectation of a favorable verdict—to prepare for perhaps the most critical stage of the proceedings.

*Id.* at 535.

The record here, in contrast, does not reflect a complete failure by trial counsel. It is more like the record in *Humphrey*, a felony murder case in which defense counsel called no witnesses to testify during punishment, the defendant was sentenced to life, and the trial court held a new-trial hearing on ineffectiveness. 501 S.W.3d at 659. Regarding the failure to present mitigating evidence during punishment, the appellant argued that counsel had failed to adequately investigate his past to identify his various mental health issues and difficult childhood. *Id.* at 662. At the new-trial hearing, appellate counsel presented records from the appellant's time in jail awaiting trial that indicated he had previously been diagnosed with bipolar disorder and had received inpatient psychiatric treatment, as well as reporting a history of loss, including childhood abuse and the violent deaths of his brother, mother, and father. *Id.* at 662–63.

The appellant's trial counsel testified that he had asked the appellant about "his history" and "everything that would be germane[,] . . . his prior convictions, his witnesses, and everything" and that he did not order the jail records because the appellant had been "consistent from day one" regarding the information he provided. *Id.* at 663. The appellant had been indicted for causing the death of an unborn baby by engaging in felony evading arrest with a vehicle that resulted in a car crash. *Id.* at 658. He had also beaten the unborn child's mother immediately before the crash and had threatened to kill her, making her an unlikely witness on his behalf. *Id.* at 658, 664. His trial counsel testified that he did not call any witnesses because he did not think anyone would testify on the appellant's behalf: although the appellant had suggested his sister, when counsel spoke with her about testifying, she refused to cooperate and had testified at a previous parole board hearing that the appellant should not receive parole. *Id.* at 663. The court concluded that *Milburn* was distinguishable because the record did not show that the appellant's trial counsel had put forth an insufficient investigative effort or that he had lacked a thorough understanding of the available evidence, and it showed that he had interviewed potential witnesses—including the appellant—and had made a strategic decision not to present any testimony. *Id.* at 664.

Rose testified that he would have told the jury about his work history, his relationship with his son, and his mental health, but he did not identify for whom he had worked either at the time of the offense or thereafter, any particular specifics

about his son, or any specific mental health condition or records that he would have or could have brought to support his contentions. *Cf. Ramirez v. State*, No. 14-05-00184-CR, 2006 WL 1026926, at *5 (Tex. App.—Houston [14th Dist.] Apr. 20, 2006, pet. ref'd) (not designated for publication) (noting that the appellant's new-trial motion included a letter from his treating psychiatrist, who testified at the hearing about the appellant's condition and stated that he was not served with a subpoena until after the trial had begun and that he had never spoken with the appellant's trial counsel or an investigator about the appellant).

In contrast, trial counsel explained why he did not call Rose to testify during the punishment phase—Rose had been upset and had planned to scold the jury. Further, during the guilt–innocence phase, the prosecutor established during Rose's testimony that Rose had full custody of his son and had used methamphetamine that night while responsible for the child. The hospital records show that CPS had become involved.

Trial counsel did not recall a specific conversation with Rose about mitigation witnesses, although he stated that he always looked for help and that he always discussed mitigation witnesses with his clients. Rose, on the other hand, testified that he had not had such a conversation with his trial counsel until the day of trial and that he would have called his father, sister, and son but that he was not told to ask them to come. The trial court had the responsibility to determine witness credibility at the hearing, and it denied the motion for new trial. *See* Tex. R. App. P. 21.3(a); *Riley v.*

31

*State*, 378 S.W.3d 453, 459 (Tex. Crim. App. 2012) ("[T]he trial court is the sole factfinder and judge of appellant's and counsel's credibility at the motion for new trial hearing, both during live testimony and in affidavits."), *overruled on other grounds by Miller v. State*, 548 S.W.3d 497 (Tex. Crim. App. 2018) (op. on reh'g).

Trial counsel testified that a jury was less likely to believe a family member, and he could have determined that allowing Rose's relatives to testify would open them up to potentially prejudicial questions about Rose's drug use, assault history, and CPS history. Trial counsel testified that "if their family is decent-looking and they act right, yeah, you call them," but the record does not reflect whether Rose's father and sister were "decent-looking" or how—as opposed to what—they testified at the new-trial hearing. The trial court could have chosen to rely on trial counsel's testimony and case assessment over the testimony of Rose and his family.

Further, Rose did not identify what additional witnesses besides his family members could have been called or show that they would have been available and what their testimony would have been. *See King*, 649 S.W.2d at 44; *cf. Milburn*, 15 S.W.3d at 268–71. And counsel was not questioned at the new-trial hearing about his performance on the other tasks Rose identified. *See Menefield*, 363 S.W.3d at 593. Accordingly, we cannot say that Rose has met his burden to show ineffective assistance, and we overrule the remainder of his first issue.

## IV. Conclusion

Having overruled all of Rose's issues, we affirm the trial court's judgment.

/s/ Wade Birdwell

Wade Birdwell
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: January 19, 2023